UNITED STATES of America,
Plaintiff,

v.

TUNICA COUNTY SCHOOL DISTRICT
et al., Defendants.

J. W. DRIVER et al., Plaintiffs,

v.

TUNICA COUNTY SCHOOL DISTRICT
et al., Defendants.

Nos. DC 6718, DC 7013.

United States District Court,
N. D. Mississippi,
Delta Division.

July 16, 1970.

H. M. Ray, U. S. Atty., Oxford, Ben Krage, Dept. of Justice, Washington, D. C., Robert J. Kelly, Batesville, for plaintiffs.

John W. Dulaney, Jr., Tunica, for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

By supplemental complaint in this school desegregation case, the United States seeks injunctive and other relief against the Board of Trustees and Superintendent of the Tunica County School District, the State of Mississippi and State Board of Education for paying out of public school funds second-semester salaries of 19 white teachers who, at the close of the first semester of the current school year, refused to accept re-assignments as directed by the school board after entry of this court's latest desegregation order and submitted their resignations as teachers in the public school system. Consolidated for hearing is a companion case instituted by black patrons of the school district, who, in addition to the foregoing issue, charge the school board with unlawfully allowing school books and other school property to be used in a private school by white students withdrawing from public school at the end of the first semester.

Certain background facts are necessary to an understanding of the legal questions presented. On May 14, 1969, following an evidentiary hearing conducted several months earlier, the United States District Court entered an order disapproving freedom of choice for the Tunica County schools and directing the school board to submit a workable plan not later than June 18, 1969, effective for the school year beginning in September. That order also directed the assignment at each of the district schools for the forthcoming year of "not less than 1 out of every 6 classroom teachers being of a different race." [1]

1. District Court's findings provided in relevant part:

"As regards faculty desegregation, the district has made some progress in that area, although scarcely more than the minimal requirements imposed by the Jefferson County type decree. However, judicial requirements for faculty desegregation have become more stringent as transformation to a unitary system will not come to pass 'until the Board has balanced the faculty of each school so that no faculty is identifiable as being tailored for a heavy concentration of Negro or white students.' United States v. Greenwood Municipal Separate School District, supra, citing five earlier Fifth Circuit cases; United States v. Indianola Municipal Separate School District, supra. That goal must be accomplished by

Prior to entry of this order, the school board at its March 1969 meeting had actually approved the employment of designated teachers for each of its schools for 1969–70, but stating in its minutes that the board "was of the opinion that no contract of employment could be entered into with them [the teachers] until a decision was handed down by the United States District Court for the Northern District of Mississippi in the matter now pending in said court relating to faculty desegregation and other matters." Subject to that express condition, the teachers were approved. The board withheld making formal contracts until its May 1969 meeting, when it took note of the fact that although the district court had not yet acted on its case, the board should not wait longer to enter into teacher contracts and voted to do so by attaching to each teacher's contract a special provision as follows:

"Compliance with future faculty desegregation orders of the U. S. District Court may force the Board of Education to reassign Teacher to a school other than the school shown hereon, and the Board of Education hereby reserves this right. In the event of reassignment, Teacher reserves the right to terminate this Contract of Employment without prejudice. If permitted, the Board will assign Teacher to the school of the Teacher's choice."

During May and June 1969, employment contracts containing the above clause were made with all teachers presently involved, except one,[2] which specified their employment to be for one year

at a designated school with a fixed annual salary payable in 12 monthly installments beginning on the last day of the month in which school opened. The 19 white teachers, by the contract terms, were designated to teach at the Tunica Elementary and High School, which had been predominantly attended by white students.

Further evidentiary hearings on an acceptable student desegregation plan in lieu of freedom of choice were held by the district court on July 3 and July 17. On July 22 the court entered its order approving a plan by which students were assigned to schools on the basis of achievement-test scores, with students in 4 grades per year (beginning with the lower grades) to be tested and the highest scoring students assigned to formerly white schools and all others to formerly Negro schools. At the time there were 555 white and 3,155 Negro students enrolled in the system. A separate paragraph of this order dealing with faculty desegregation reaffirmed that the teacher racial ratio would be 1 to 6 at each school for 1969–70, and for 1970–71 and thereafter full faculty and staff desegregation, to such an extent that the faculty at each school be not identifiable to the race of the majority of the students at any such school.

At the conclusion of the July 17 hearing, this court had indicated from the bench that it would approve use of the achievement testing plan, later incorporated in its order as above set forth. On July 19, the board met with most of the Tunica Elementary and High School teachers then under contract, explained

the beginning of the 1970–71 school year. U. S. v. Board of Education of Bessemer, Alabama, 393 F.2d 690 (5 Cir. 1968). Interim arrangements effective for the school year beginning in September 1969 must be made to accomplish a faculty at each school having not less than 1 out of every 6 classroom teachers of a different race. The duty of assigning faculty according to these requirements is not optional with the desires of the district or the wishes of teachers. Where persuasion or consent is not forthcoming, the

district must withhold approval of contracts, if necessary, to achieve faculty desegregation and actively promote faculty and staff desegregation. Contracts with teachers interferring with this duty must be deemd invalid and unenforceable. United States v. Greenwood Municipal Separate School District, supra."

2. The only teacher whose employment contract did not contain the special clause was Jim Isbell, who was not employed until August 19, 1969.

the terms of the desegregation order respecting assignment of students and informed them that on the basis of the 1 to 6 teacher ratio, each teacher would be able to teach at Tunica School specified by written contract as the board had hired other white teachers for Dundee and Rosa Fort to satisfy the court order. The Tunica teachers found this information to be generally satisfactory, and they entered upon their employment with that understanding.

Both the school board and the United States appealed from the district court's judgment of July 22, 1969; and that judgment was summarily reversed on January 6, 1970. United States of America v. Tunica County School District, 5 Cir., 421 F.2d 1236. The Fifth Circuit Court of Appeals not only condemned the achievement test method of assignment but remanded the case for further proceedings in conformity with Singleton v. Jackson Municipal Separate School District, 5 Cir. 1969, 419 F.2d 1211, 1212, especially Part I (faculty and staff desegregation), with the board mandated "to submit a desegregation plan to provide a unitary school system * * * not later than January 15, 1970," and to take steps "for complete student desegregation by February 1, 1970," should the Supreme Court in Carter v. West Feliciana School Board, 1970, 396 U.S. 290, 90 S.Ct. 908, 24 L. Ed.2d 477, so require, as it subsequently did.

Pursuant to the Court of Appeals' mandate, this court on January 7 directed submission of a new plan as required which "with respect to desegregation of faculty and staff * * * shall comply with the terms, provisions and conditions (including time specified) in Singleton and consolidated cases (Parts I and III)". On January 15, the school board filed a new desegregation plan based upon geographic zoning, and this was accepted, with one change, by the district court, on January 23. The court, by its order, also directed the board, in terms expressly required by Singleton, to assign principals, teachers and staff effective February 2, "so that the ratio of Negro to white teachers in each school and the ratio of other staff in each are substantially the same as each such ratio is to the teachers and other staff respectively in the entire system." Also the board was required, to the extent necessary, to "direct members of its staff as a condition of continued employment to accept new assignments."

On January 24, which was the day following the entry of the last court order, the school board met and directed teacher reassignments to its three operating schools, Rosa Fort, Dundee and Tunica, to comply with the court's order. Upon being informed of the reassignments, 18 white teachers reassigned to Rosa Fort or Dundee schools refused to accept their reassignments and during the last week in January submitted their resignations, effective January 30, which was the end of the first semester. Shortly thereafter the 19th white teacher, who had been reassigned to Tunica High School, submitted his resignation after that school also became all-black under the desegregation order.

On January 30, the board met to consider the request of some teachers[3] refusing reassignment that their contracts "should be honored since they were employed to teach in the Tunica School for the full year, 1969–70, and, not only had they been reassigned contrary to their contract with the board, but the Tunica School (formerly white) under the court order had been changed so that many could not teach in the school even if they had not been reassigned;" and that they should be paid the balance of their salaries for the full school year. It was the consensus of the board that the request was well taken and the board had "a moral as well as a legal obligation" to pay them (and any

---

3. Only two teachers, Annie E. Herring and Edith C. Moore, had written letters containing direct or indirect demand for payment of the unearned portion of their salaries.

other teachers refusing reassignment) the balance of the school year's salary.[4]

On February 2, 1970, the board paid, in lump sum payments, 18 white teachers who had resigned for refusal to accept assignments: Oliver T. Aust, Reva L. Bland, Maynard R. Brigance, Jr., Agnes B. Coalter, Billy E. Daniels, Robert A. Harris, Jr., Annie E. Herring, James H. Isbell, Barbara T. Jepsen, Virginia L. Kittle, Rita D. Land, Edith C. Moore, Ramsay C. Owens, Mattie Shepherd, Alva E. Terry, Tommy P. Thornton, Janie S. Turner and Ann Wright. On February 10, 1970, Billy T. Walker, the white teacher reassigned to Tunica High School who resigned, was, upon board approval, paid his contract salary for the remainder of the year. In all, the total salaries paid to these teachers for the period after their resignation was $51,877.46. That amount included $29,785.82 from State Minimum Program Fund and $22,091.64 from school district funds.

On February 2, 1970, the first day of the second semester, no. white child enrolled at any of the district schools. Instead, the Tunica Church School opened with an all-white enrollment of 340 students and an all-white faculty composed of 21 teachers, 18 of whom had refused reassignment in public schools and were paid the remainder of their salaries.[5] The private school was organized as follows: Grades 1–3, Presbyterian Church, grades 4–6, Methodist Church, and grades 7–12, Baptist Church. All or almost all of the 340 students attending the church school had been enrolled in the Tunica County public schools during the first semester, and none of the 428 white students attending the public schools during the first semester enrolled in them during the second semester. The Tunica Church School charged no tuition of its students and its teachers received no remuneration for their services during the second semester. The church school held organized classes in which, for the most part, teachers and students met as they had during the first semester in the Tunica Elementary and High School, and the operation was supervised and directed by Jim Isbell as to grades 7 to 12 and by Billy E. Daniels as to grades 1 through 6. The church school met daily on stated time schedules.[6] The students used the same textbooks which they kept in their possession after leaving the public schools.

It was common knowledge in Tunica that with the adoption of a zoning desegregation plan, the white students would withdraw from the public schools for the second semester irrespective of decisions made by white teachers regarding their employment. After this court entered such an order, the public schools were closed for the week of Jan-

4. Board minutes reflect that the resolution to pay the teachers was on motion made by Roy C. Smith, seconded by John E. Matthew, and adopted by majority vote. Mrs. S. C. Wilson, one of the Trustees, voted against the motion. Other trustees who were present at the meeting and apparently voted in favor of payment were Roy C. Smith, John E. Matthews, Richard Hussey and Wesley R. Bailey.

5. The only white teacher who resigned but did not join the church school faculty had become physically incapacitated and was unable to teach.

6. On January 29, Jim Isbell had released the following notice to the white parents: "NOTICE TO PARENTS:
   Schedule for Monday, Feb. 2:
   Students in grades 1–3 will report to the Presbyterian Church. Students in grade 4–6 will report to the Methodist Church. Students in grades 7–12 will report to the Baptist Church.

   Parents will be responsible for their children's transportation to the churches. School will begin at 8:00 a. m. and dismiss at 1:30 p. m. A teacher will be on duty from 7:30 til 2:00. Students should not arrive before 7:30 and arrangements should be made to pick up students before 2:00. Students are not to be at the churches unsupervised.

   Students in grades 1–6 should bring a snack for their milk break in the morning. Students in grade 7–12 will be given a break in the morning. Cokes will be available during break and snack food should be brought for this period if desired."

uary 23, in preparation for implementation of the new attendance plan. It was during this week that Tunica Church School was born. Jim Isbell, the Tunica High School assistant principal, who was to refuse reassignment, contacted the three church organizations to obtain consent for the use of their property for holding classes and on or about January 28 he called a meeting of white school patrons at the Baptist Church to discuss organization of the church school. At this meeting Isbell distributed his notice (Fn. 6) to those present. The faculty naturally "gravitated" to the new enterprise after word had disseminated throughout the small community of Tunica that the school board felt morally bound to pay any teacher refusing to accept mid-year reassignment, and that the State Attorney General had issued a ruling that the board might legally pay the full year's salary to teachers resigning under such circumstances.

On January 9, which was almost immediately after this court had ordered the board to provide for faculty desegregation in accordance with the mandate of the Court of Appeals, the school board, through its attorney, sought an opinion from A. F. Summer, Attorney General of Mississippi, as to whether "it had the legal right to pay a teacher who refuses reassignment [because of federal court desegregation orders] yet demands her salary." On January 15 the State Attorney General, acting through an assistant, issued his opinion that the board had the legal authority to make such payment. This opinion, which fully incorporates the question posed by the school board's attorney, is as follows:

"Dear Mr. Dulaney:

This will acknowledge receipt of your letter of January 9, 1970, in which you inquire as follows:

'The Board of Education of Tunica County, Mississippi and our Superintendent of Education need your opinion as to whether or not teachers employed for the 1969-1970 school year can be paid their salary if they refuse to accept reassignment to another school in order to fulfill requirements of an order of the United States District Court.

'The Tunica County School District was placed under an order of the United States District Court for the Northern District of Mississippi, Delta Division on January 19, 1968. The decree entered at that time was basically a *Jefferson* type decree requiring substantial integration of faculty.

'In the spring and summer of 1969, we employed teachers for the 1969-70 school year, the contract in each instance providing that the Board reserved the right to assign the teacher to such school as may be necessary in order to comply with desegregation requirements of the Federal Court. The specific language in these contracts is as follows:

'Compliance with future faculty desegregation, order of the U. S. District Court may force the Board of Education to reassign teachers to a school other than the school shown hereon, and the Board of Education hereby reserves this right. In the event of reassignment teacher reserves the right to terminate this contract of employment without prejudice. If permitted the Board will assign teacher to the school of the teacher's choice.'

'Thereafter, on July 22, 1969, another order was entered by the Federal Court making changes in faculty and staff desegregation, so that not less than one in six classroom teachers in each school would have to be of a different race for the 1969-1970 school year.

'Subsequently, we were able to achieve this one in six ratio in all of our schools, and accordingly, definite assignments were made for all teachers in the system, and accepted by them.

'On January 6, 1970, the Tunica County School Board was directed to further desegregate its faculty beginning February 1, 1970 in accordance

with Section III of the *Singleton* case which in general provides that teachers must be assigned to each attendance center in the same ratio as the ratio between Negro and white teachers in the system.

'Some of the teachers are refusing to accept reassignment in the middle of the year and insist that they are entitled to teach in the school to which they started in September, 1969 and, if the Board of Education reassigns them, they do not have to accept such reassignment, but are still entitled to their pay for the remainder of the school year.

'We urgently need your opinion as to whether or not the Board of Education of Tunica County has the legal right to pay a teacher who refuses reassignment yet demands her salary for the remainder of this school year.'

Section 6282-13, Mississippi Code of 1942, Recompiled and Amended, after providing that each teacher shall enter into a contract, states as follows:

' * * * (S)uch contracts shall be in such form as shall be prescribed by the State Board of Education and shall be executed in duplicate with one copy to be retained by the county superintendent or municipal separate school district superintendent, as the case may be, and one copy to be retained by the superintendent, principal or teacher contracted with. The contract shall show the name of the school, the length of the school term, the position held, whether a superintendent, principal or teacher, the number of scholastic years which it covers, the total amount of the annual salary and how same is payable * * *'

The language which is contained in the contract as quoted in your letter has not been prescribed by the State Board of Education and was, therefore, unauthorized. Therefore, such language may be ignored in the determination of the right of the teacher. It is my opinion that the Board of Education of Tunica County has the legal right to pay a teacher who refuses reassignment during the middle of a school year but demands her salary for the remainder of this school year.

Sincerely,

A. F. SUMMER, ATTORNEY
GENERAL
By: Maurice R. Black
Assistant Attorney General"

At the May 21 evidentiary hearing, the proof disclosed that the Tunica Church School would operate only one week longer and then disband. It did not propose to issue diplomas or have graduation. No teachers had plans for returning to that school, and the school books, which the board had made no effort to retrieve earlier, would then be returned by the students to the public school officials.[7]

Plaintiffs contend that the payments to the teachers were unlawful and unconstitutional because they were made for the purpose and effect of supporting a racially segregated school contrary to the Fourteenth Amendment and such action directly interfered with the court's desegregation order. Defendants deny that they paid the teachers with any intention to aid or establish a racially segregated private school but did so only to satisfy a legal and moral duty owing to the teachers. Defendants also disclaim any intention to thwart or not carry out federal court desegregation orders.

■ It cannot be gainsaid that Tunica Church School, despite its informal organization and limited duration, was an all-white, racially segregated school. On the record we hold that, re-

---

7. Counsel for individual plaintiffs, following the evidentiary hearing, advised the court that all school books in the hands of the withdrawing white students who attended the church school were returned to the public school officials when the church school closed as per schedule. Also, counsel for individual plaintiffs at the May 21 hearing stated that the issue concerning the district's sale of certain school buses had been satisfactorily resolved between the parties.

gardless of what the school board may have intended, the *effect* of its voluntary decision to pay salary balances to all teachers refusing reassignment was to furnish material aid to continuing segregated education in Tunica County by means of a private school. We have no doubt that the white students would have withdrawn from public schools, even if all 19 teachers had accepted their reassignments and also the 19 teachers or the great majority would have likely resigned their employment even if it meant loss of further compensation. Yet it is equally true, and the court so finds, that without their compensation so provided for, these teachers could not have donated their services to the private school or the children attending it. It was only because the school board had, in effect, given them an option of receiving pay for no work that they were in position to consider teaching in the private school without additional compensation. The court may not ignore plain and undisputed facts. The board saw fit to pay certain teachers more than $51,000 at a time when the church school was entirely without funds or teachers. Thus, the actions of the school board were a major, if not the dominant, influence in making it possible for a segregated private school to function on short notice. As agents of the state, defendants may not constitutionally lend aid to a segregated private school. Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833 (E.D.La.1967), aff'd per curiam 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Coffey v. State Educational Finance Commission, 296 F.Supp. 1389 (S.D.Miss.1969). In Griffin v. State Board of Education, 296 F.Supp. 1178 (E.D.Va.1969), the Court stated at 1181:

> "To repeat, our translation of the imprimatur placed upon *Poindexter* by the final authority is that *any* assist *whatever* by the State towards provision of a racially segregated education, exceeds the pale of tolerance de-marked by the Constitution." [emphasis in original].

Federal courts have invalidated attempts to aid private schools, which were apparently innocent on their face, but demonstrated to be an effort to avoid desegregation. See Hall v. St. Helena Parish School Board, 197 F.Supp. 649 (E.D.La.1961), aff'd per curiam 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed. 2d 521 (1962); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967); Coffey v. State Educational Finance Commission, supra. The fact that the school board obtained a favorable ruling from the Attorney General may not shield it against constitutional violations; indeed, such an opinion serves to emphasize that the payments were State action. State support of segregated schools "through any arrangement, management, funds or property cannot be squared with the [Fourteenth] Amendment," Cooper v. Aaron, 358 U.S. 1, at 19, 78 S.Ct. 1401, at 1409, 3 L.Ed. 2d 5, at 17.

Defendants also argue that, regardless of the effect of their action, they paid the teachers only because of a moral and legal duty owing to them. This duty is claimed to rest on certain oral assurances given by board members at the time of "final employment" that the teachers at the Tunica school would not be reassigned.

However, the clear evidence is that the board, in fact, acted voluntarily and under no direct compulsion. The payments were made without legal demand or filing of suit and each teacher promptly received one check for the balance of the year's compensation instead of being paid monthly as provided by the contract. All teachers, except Isbell, knew that by their written contract the school board reserved the right to reassign them to another school, if so ordered by the federal court, in which case they retained the right of contract termination. Each contracting party had thus obtained protection against the unknown and unknowable future desegregation orders. Oral assurances that the

district court's order, soon to be in process of appeal, would apply for the full school year may be only regarded as an expression of hope, but of no legal effect, because teachers and school board members alike were charged with notice that district court orders were subject to those issued by the Court of Appeals. While that Court's *Singleton* faculty requirements were not handed down until December 1, it was at once known that those requirements would be fully effective no later than February 1 regardless of prior contracts, as teachers were specifically required to accept reassignment *as a condition of continued employment.* Moreover, it was known by everyone interested that the *Singleton* new requirements for faculty and staff desegregation would be uniformly applied in all school cases pending throughout the Fifth Circuit and, as earlier stated, on January 6 the Court of Appeals positively mandated this requirement for the Tunica County School District.

▊ Under these circumstances, the court cannot accept as a valid defense the board's sympathetic feelings for white teachers who refused to accept reassignments or, as with one teacher, who refused to teach longer in the same school because of dislike for the desegregation plan. Actually, the board's affirmative legal duty was to terminate salary payments to any teacher refusing reassignment as directed to achieve court-required faculty desegregation. This was plainly spelled out in the *Singleton* case, requiring teachers to accept their new assignments "as a condition of continued employment." Moreover, the

duty had been clearly forecast long before defendant school board gave oral assurances to its teachers. In United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (5 Cir. 1969) at 1094, the Court held:

"The board further protests that it cannot achieve faculty desegregation by transferring teachers to different schools because under state law teacher contracts are for specific schools, thus making the reassignment of a teacher a breach of contract. Again, however, a state law is invalid to the extent that it frustrates the implementation of a constitutional mandate. This is the position the board must take if it is faced with lawsuits brought by teachers who have been reassigned and are alleging breach of contract."

▊ Defendants finally urge that, regardless of other considerations, they paid the teachers in good faith after having obtained a ruling from the State Attorney General and are, by statute,[8] shielded against civil liability, including the relief sought against them in this case. It may be conceded that ordinarily, where no litigation is pending, school officials, as public officers, are protected against individual liability by acting in good faith in accordance with the Attorney General's written opinion. Even if the school board had a legal problem justifying a § 3834 opinion, which seems highly doubtful, that officer's conclusion was manifestly wrong and without substantial support because of the following evident errors: (1) it ignored the pendency of a federal desegregation suit

8. Miss.Code Ann. § 3834 provides that the Attorney General shall give his opinion in writing, without fee, to public officers, including county school officials, and that:

"When any officer, board, commission, department or person, authorized by this section to require such written opinion of the attorney general, shall have done so and shall have stated all the facts to govern such opinion, and the attorney general has prepared and delivered a legal opinion with reference thereto, there shall be no liability, civil or criminal, accruing to or against any such officer, board, commission, department or person, who, in good faith, follows the direction of such opinion and acts in accordance therewith, unless a court of competent jurisdiction, after a full hearing, shall judicially declare that such opinion is manifestly wrong and without any substantial support. Provided, no opinion shall be given or considered if said opinion is given after suit is filed or prosecution begun."

against the school officials who sought the opinion, (2) it ignored the positive *Singleton* mandate against the Tunica County School Board to reassign teachers as a condition of their continued employment, and (3) it ignored the plain contrary provisions of the teachers' contracts and relied upon state statute, in spite of *Greenwood*.[9] Therefore, the Attorney General's ruling, which was itself infected with unconstitutionality, cannot be relied upon by the school board to justify an unconstitutional action.

The only question remaining relates to the character of relief which is proper for this court to grant. At the outset, the court holds that the issue regarding school books raised by the individual plaintiffs has been rendered moot by the return of all school books to the public schools at the close of the church school. As to the issue regarding the teachers' payments, the court is to be guided by the particular facts in the case so that in the exercise of its equity powers proper relief may be granted. The court finds that the Attorney General's opinion dated January 15, 1970, to the Tunica County School District was unconstitutional and did not afford a lawful basis for the school district to pay teachers refusing to accept reassignment as directed by federal court desegregation orders, and that all defendants should be enjoined from making any further payments of such character.

There is left the matter of awarding appropriate relief respecting the more than $51,000 unconstitutionally paid to the teachers in February 1970. All defendants, the County School Board and its Superintendent, as well as the State Board of Education, shall be required to take such steps as are reasonably necessary to recover the amount of money paid to each of the 19 teachers refusing reassignment and by October 1, 1970, report to this court on the steps taken by them to effect such recovery and the sums recovered. They are under a duty to recover public funds paid out unlawfully. Griffin v. County School Board of Prince Edwards County, Virginia, 363 F.2d 206 (4 Cir. 1966), cert. denied 385 U.S. 960, 87 S.Ct. 395, 17 L.Ed.2d 305.

In event the above steps prove inadequate to insure an equitable result, the court reserves for future decision, after further hearing, the question of whether to adjudge personal liability for those sums not recovered from the 19 teachers, as to all or any of the following individuals:

(a) Those members of the school board identified as voting in favor of payment;

(b) The County Superintendent of Education for his role in issuing school warrants to the teachers;

(c) Those members of the State Board of Education shown to have per-

---

9. There are several state statutes not cited in the Attorney General's opinion which appear to be pertinent in determining state law.

For example, Miss.Code Ann., 1968 Supp., § 6282–19, provides in pertinent part as follows:

"No superintendent, principal or teacher in any public school shall be paid, in whole or in part, with funds allotted or belonging to any school district unless such superintendent, principal or teacher is employed in such school district and is actually teaching or otherwise performing professional duties therein."

§ 6282–14 provides:

"If a superintendent, principal or teacher is released during the school term by agreement between the board of trustees and the superintendent, principal or teacher, then such superintendent, principal or teacher shall be entitled to such proportion of the annual salary as the time which he shall have taught shall bear to the total school term. * * *"

§ 6282–15 provides:

"If any teacher, superintendent or principal shall willfully and without just cause breach his contract and abandon his employment he shall not be entitled to any further payments for salary either for services rendered prior to such breach or for services which were thereafter to have been rendered."

sonal knowledge that said funds were being used to pay school teachers in Tunica County who had refused to accept reassignment and were no longer rendering service to the public schools of that county and consented to such use of state funds;[10] and

(d) The official sureties of each individual cast in personal responsibility, after such surety has first been summoned to appear in this proceeding and given full opportunity to make defenses available. All parties shall have the right to supplement the record only as it may relate to the issue of personal liability.

The court will this date enter an order granting the above relief.

10. On the evidence presented, this court is not able to conclude whether the members of the State Board of Education had actual knowledge of, and consented to, paying salary balances to teachers who refused to accept their assignments.