NORWOOD ET AL. *v.* HARRISON ET AL.

No. 72–77.  Argued February 20–21, 1973—Decided June 25, 1973

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS and BRENNAN, JJ., concurred in the result.

*Melvyn R. Leventhal* argued the cause for appellants. With him on the briefs were *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston, Norman J. Chachkin,* and *Anthony G. Amsterdam.*

*William A. Allain,* First Assistant Attorney General of Mississippi, argued the cause for appellees. With him on the brief were *A. F. Summer,* Attorney General, and *Heber Ladner, Jr.,* Special Assistant Attorney General.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

A three-judge District Court sustained the validity of a Mississippi statutory program under which textbooks are purchased by the State and lent to students in both public and private schools, without reference to whether any participating private school has racially discriminatory policies. 340 F. Supp. 1003 (ND Miss. 1972). We noted probable jurisdiction, 409 U. S. 839.

---

*Solicitor General Griswold, Assistant Attorney General Pottinger, Deputy Solicitor General Wallace, Harriet S. Shapiro, Brian K. Landsberg,* and *Thomas M. Keeling* filed a memorandum for the United States as *amicus curiae* urging reversal.

## I

Appellants, who are parents of four schoolchildren in Tunica County, Mississippi, filed a class action on behalf of students throughout Mississippi to enjoin in part the enforcement of the Mississippi textbook lending program. The complaint alleged that certain of the private schools excluded students on the basis of race and that, by supplying textbooks to students attending such private schools, appellees, acting for the State, have provided direct state aid to racially segregated education. It was also alleged that the textbook aid program thereby impeded the process of fully desegregating public schools, in violation of appellants' constitutional rights.

Private schools in Mississippi have experienced a marked growth in recent years. As recently as the 1963–1964 school year, there were only 17 private schools other than Catholic schools; the total enrollment was 2,362 students. In these nonpublic schools 916 students were Negro, and 192 of these were enrolled in special schools for retarded, orphaned, or abandoned children.[1] By September 1970, the number of private non-Catholic schools had increased to 155 with a student population estimated at 42,000, virtually all white. Appellees do not challenge the statement, which is fully documented in appellants' brief, that "the creation and enlargement of these [private] academies occurred simultaneously with major events in the desegregation of public schools . . . ."[2]

This case does not raise any question as to the right of citizens to maintain private schools with admission limited to students of particular national origins, race, or religion or of the authority of a State to allow such

---

[1] App. 40–41.

[2] Brief for Appellants 8–9.

schools. See *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925). The narrow issue before us, rather, is a particular form of tangible assistance the State provides to students in private schools in common with all other students by lending textbooks under the State's 33-year-old program for providing free textbooks to all the children of the State. The program dates back to a 1940 appeal for improved educational facilities by the Governor of Mississippi to the state legislature. The legislature then established a state textbook purchasing board and authorized it to select, purchase, and distribute free textbooks for all schoolchildren through the first eight grades.[3] In 1942, the program was extended to cover all high school students, and, as codified, the statutory authorization remains substantially unchanged. Miss. Code Ann. § 6634 *et seq.* (1942).

Administration of the textbook program is vested in the Mississippi Textbook Purchasing Board, whose members include the Governor, the State Superintendent of Education, and three experienced educators appointed by the Governor for four-year terms. *Id.,* §§ 6634, 6641. The Board employs a full-time administrator as its Executive Secretary. Textbooks may be purchased only "for use in those courses set up in the state course of study adopted by the State Board of Education, or courses established by special acts of the Legislature." *Id.,* § 6646. For each course of study, there is a "rating committee" composed of appointed members, *id.,* § 6641 (1)(d), and only those books approved by the relevant rating committee may be purchased from publishers at a price which cannot "be higher than the lowest prices at which the same books are being sold anywhere in the United States." *Id.,* § 6646 (1).

---

[3] See *Norwood* v. *Harrison*, 340 F. Supp. 1003, 1007 (ND Miss. 1972).

The books are kept at a central book repository in Jackson. *Id.,* § 6641 (1)(f). Appellees send to each school district, and, in recent years, to each private school [4] requisition forms listing approved textbooks available from the State for free distribution to students. The local school district or the private school sends a requisition form to the Purchasing Board for approval by the Executive Secretary, who in turn forwards the approved form to the Jackson book repository where the order is routinely filled and the requested books shipped directly to the school district or the private school.

The District Court found that "34,000 students are presently receiving state-owned textbooks while attending 107 all-white, nonsectarian private schools which have been formed throughout the state since the incep-

---

[4] The regulation for distribution of state-owned textbooks from 1940 through 1970 provided as follows:

"For the distribution of free textbooks the local control will be placed in the hands of the County Superintendent of Education. All requisitions for books shall be made through him and all shipments of books shall be invoiced through him. At his discretion he may set up certain regulations governing the distribution of books within the county, such regulations not to conflict with the regulations adopted by the State Textbook Board or provisions of the Free Textbook Act."

This regulation was revised on October 14, 1970, to read as follows:

"*Public Schools.* The administration of the textbook program in the public schools shall be the responsibility of the administrative heads of the county units, consolidated districts, and municipal separate districts set up by the Legislature. All textbook transactions between the public schools and the State shall be carried on through them. It shall be the duty of these local custodians to render all reports required by the State; to place orders for textbooks for the pupils in their schools . . . .

"*Private Schools.* Private and parochial school programs shall be the responsibility of the State Textbook Board. All textbook transactions will be carried out between the Board and the administrative heads of these schools. Their duties shall be the same as outlined above for public schools."

tion of public school desegregation." 340 F. Supp., at 1011.[5]  During the 1970–1971 school year, these schools held 173,424 books, for which Mississippi paid $490,239. The annual expenditure for replacements or new texts is approximately $6 per pupil, or a total of approximately $207,000 for the students enrolled in the participating private segregated academies, exclusive of mailing costs which are borne by the State as well.

In dismissing the complaint the District Court stressed, first, that the statutory scheme was not motivated by a desire to further racial segregation in the public schools, having been enacted first in 1940, long before this Court's decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), and consequently, long before there was any occasion to have a policy or reason to foster the development of racially segregated private academies. Second, the District Court took note that providing textbooks to private *sectarian* schools had been approved by this Court in *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and that "[t]he essential inquiry, therefore, is whether we should apply a more stringent standard for determining what constitutes state aid to a school in the context of the Fourteenth Amendment's ban against denial of the equal protection of the law than the Supreme Court has applied in First Amendment cases." 340 F. Supp., at 1011.  The District Court held no more stringent standard should apply on the facts of this case, since, as in *Allen,* the books were provided to the students and not to the schools.  Finally, the District Court concluded that the textbook loans did not interfere with or impede the State's acknowledged duty to establish a unitary

---

[5] The variation in the figures as to schools and students is accounted for by the District Court's omission of particular kinds of schools in making the findings.  The earlier and higher figures are found in the briefs and are not disputed.

school system under this Court's holding in *Green* v. *County School Board*, 391 U. S. 430, 437 (1968), since

"[d]epriving any segment of school children of state-owned textbooks at this point in time is not necessary for the establishment or maintenance of state-wide unitary schools. Indeed, the public schools which plaintiffs acknowledge were fully established as unitary schools throughout the state no later than 1970–71, continue to attract 90% of the state's educable children. There is no showing that any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools." 340 F. Supp., at 1013.

## II

In *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), the Court held that a State's role in the education of its citizens must yield to the right of parents to provide an equivalent education for their children in a privately operated school of the parents' choice. In the 1971 Term we reaffirmed the vitality of *Pierce,* in *Wisconsin* v. *Yoder*, 406 U. S. 205, 213 (1972), and there has been no suggestion in the present case that we alter our view of *Pierce*. Yet the Court's holding in *Pierce* is not without limits. As Mr. Justice White observed in his concurring opinion in *Yoder, Pierce* "held simply that while a State may posit [educational] standards, it may not pre-empt the educational process by requiring children to attend public schools." *Id.*, at 239.

Appellees fail to recognize the limited scope of *Pierce* when they urge that the right of parents to send their children to private schools under that holding is at stake in this case. The suggestion is made that the rights of parents under *Pierce* would be undermined were the lending of free textbooks denied to those who attend private

schools—in other words, that schoolchildren who attend private schools might be deprived of the equal protection of the laws were they invidiously classified under the state textbook loan program simply because their parents had exercised the constitutionally protected choice to send the children to private schools.

We do not see the issue in appellees' terms. In *Pierce,* the Court affirmed the right of private schools to exist and to operate; it said nothing of any supposed right of private or parochial schools to share with public schools in state largesse, on an equal basis or otherwise. It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.

The appellees intimate that the State *must* provide assistance to private schools equivalent to that which it provides to public schools without regard to whether the private schools discriminate on racial grounds. Clearly, the State need not. Even as to church-sponsored schools whose policies are nondiscriminatory, any absolute right to equal aid was negated, at least by implication, in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). The Religion Clauses of the First Amendment strictly confine state aid to sectarian education. Even assuming, therefore, that the Equal Protection Clause might require state aid to be granted to private nonsectarian schools in some circumstances—health care or textbooks, for example—a State could rationally conclude as a matter of legislative policy that constitutional neutrality as to sectarian schools might best be achieved by withholding all state assistance. See *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1 (1973). In the same way, a

State's special interest in elevating the quality of education in both public and private schools does not mean that the State must grant aid to private schools without regard to constitutionally mandated standards forbidding state-supported discrimination. That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.

### III

The District Court's holding therefore raises the question whether and on what terms a State may—as a matter of legislative policy—provide tangible assistance to students attending private schools. Appellants assert, not only that the private schools are in fact racially discriminatory, but also that aid to them in any form is in derogation of the State's obligation not to support discrimination in education.

This Court has consistently affirmed decisions enjoining state tuition grants to students attending racially discriminatory private schools.[6] A textbook lending program is not legally distinguishable from the forms of state assistance foreclosed by the prior cases. Free textbooks, like tuition grants directed to private school

---

[6] *Brown* v. *South Carolina Board of Education,* 296 F. Supp. 199 (SC), aff'd *per curiam,* 393 U. S. 222 (1968); *Poindexter* v. *Louisiana Financial Assistance Comm'n,* 275 F. Supp. 833 (ED La. 1967), aff'd *per curiam,* 389 U. S. 571 (1968). See *Wallace* v. *United States,* 389 U. S. 215 (1967), aff'g *Lee* v. *Macon County Board of Education,* 267 F. Supp. 458, 475 (MD Ala.). Mississippi's tuition grant programs were invalidated in *Coffey* v. *State Educational Finance Comm'n,* 296 F. Supp. 1389 (SD Miss. 1969); *Coffey* v. *State Educational Finance Comm'n,* SD Miss., CA No. 2906, decided Sept. 2, 1970 (unreported). The latter case involved a statute which provided for tuition loans rather than tuition grants. See *Green* v. *Connally,* 330 F. Supp. 1150 (DC), aff'd *sub nom. Coit* v. *Green,* 404 U. S. 997 (1971).

students, are a form of financial assistance inuring to the benefit of the private schools themselves.[7] An inescapable educational cost for students in both public and private schools is the expense of providing all necessary learning materials. When, as here, that necessary expense is borne by the State, the economic consequence is to give aid to the enterprise; if the school engages in discriminatory practices the State by tangible aid in the

---

[7] Appellees misperceive the "child benefit" theory of our cases decided under the Religion Clauses of the First Amendment. See, e. g., *Cochran* v. *Louisiana Board of Education*, 281 U. S. 370 (1930), and *Board of Education* v. *Allen*, 392 U. S. 236 (1968). In those cases the Court observed that the direct financial benefit of textbook loans to students is "to parents and children, not to schools," *id.*, at 244, in the sense that parents and children—not schools—would in most instances be required to procure their textbooks if the State did not. But the Court has never denied that "free books make it more likely that some children choose to attend a sectarian school," *ibid.*, just as in other cases involving aid to sectarian schools we have acknowledged that the various forms of state assistance "surely aid these [religious] institutions . . . in the sense that religious bodies would otherwise have been forced to find other sources from which to finance these services." *Tilton* v. *Richardson*, 403 U. S. 672, 679 (1971). Plainly, religion benefits indirectly from governmental aid to parents and children; nevertheless, "[t]hat religion may indirectly benefit from governmental aid . . . does not convert that aid into an impermissible establishment of religion." *Lemon* v. *Kurtzman*, 403 U. S. 602, 664 (1971) (opinion of WHITE, J.).

The leeway for indirect aid to sectarian schools has no place in defining the permissible scope of state aid to private racially discriminatory schools. "State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws." *Cooper* v. *Aaron*, 358 U. S. 1, 19 (1958). Thus MR. JUSTICE WHITE, the author of the Court's opinion in *Allen, supra,* and a dissenter in *Lemon* v. *Kurtzman, supra,* noted there that in his view, legislation providing assistance to any sectarian school which restricted entry on racial or religious grounds would, to that extent, be unconstitutional. *Lemon, supra,* at 671 n. 2. See Part IV, *infra*.

form of textbooks thereby gives support to such discrimination. Racial discrimination in state-operated schools is barred by the Constitution and "[i]t is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Lee* v. *Macon County Board of Education,* 267 F. Supp. 458, 475–476 (MD Ala. 1967).

We do not suggest that a State violates its constitutional duty merely because it has provided *any* form of state service that benefits private schools said to be racially discriminatory. Textbooks are a basic educational tool and, like tuition grants, they are provided only in connection with schools; they are to be distinguished from generalized services government might provide to schools in common with others. Moreover, the textbooks provided to private school students by the State in this case are a form of assistance readily available from sources entirely independent of the State—unlike, for example, "such necessities of life as electricity, water, and police and fire protection." *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 173 (1972). The State has neither an absolute nor operating monopoly on the procurement of school textbooks; anyone can purchase them on the open market.

The District Court laid great stress on the absence of a showing by appellants that "any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools." 340 F. Supp., at 1013. We can accept this factual assertion; we cannot and do not know, on this record at least, whether state textbook assistance is the determinative factor in the enrollment of any students in any of the private schools in Mississippi. We do not agree with the District Court in its analysis of the legal consequences of this uncertainty, for the Constitution

does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school. A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination. "[D]ecisions on the constitutionality of state involvement in private discrimination do not turn on whether the state aid adds up to 51 percent or adds up to only 49 per cent of the support of the segregated institution." *Poindexter* v. *Louisiana Financial Assistance Comm'n,* 275 F. Supp. 833, 854 (ED La. 1967).[8]

The recurring theme of appellees' argument is a sympathetic one—that the State's textbook loan program is extended to students who attend racially segregated private schools only because the State sincerely wishes to foster quality education for all Mississippi children, and, to that end, has taken steps to insure that no sub-group of schoolchildren will be deprived of an important educational tool merely because their parents have chosen to enroll them in segregated private schools. We need not assume that the State's textbook aid to private schools has been motivated by other than a sincere interest in the educational welfare of all Mississippi children. But good intentions as to one valid objective do not serve to negate the State's involvement in violation of a constitutional duty. "The existence of a permissible purpose cannot sustain an action that has an impermissible effect." *Wright* v. *Council of City of Emporia,* 407 U. S. 451, 462 (1972). The Equal Protection Clause would

---

[8] Accord, *Griffin* v. *State Board of Education,* 296 F. Supp. 1178, 1181 (ED Va. 1969), superseding *Griffin* v. *State Board of Education,* 239 F. Supp. 560 (ED Va. 1965); *Brown* v. *South Carolina Board of Education, supra.*

be a sterile promise if state involvement in possible private activity could be shielded altogether from constitutional scrutiny simply because its ultimate end was not discrimination but some higher goal.

The District Court offered as further support for its holding the finding that Mississippi's public schools "were fully established as unitary schools throughout the state no later than 1970–71 [and] continue to attract 90% of the state's educable children." 340 F. Supp., at 1013. We note, however, that overall statewide attendance figures do not fully and accurately reflect the impact of private schools in particular school districts.[9] In any event, the constitutional infirmity of the Mississippi textbook program is that it significantly aids the organization and continuation of a separate system of private schools which, under the District Court holding, may discriminate if they so desire. A State's constitutional obligation requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination.

---

[9] In Tunica County, for example, where appellants reside, in response to *Green* v. *Connally, supra,* and *Alexander* v. *Holmes County Board of Education,* 396 U. S. 19 (1969), all white children were withdrawn from public schools and placed in a private academy housed in local church facilities and staffed by the principal and 17 high school teachers of the county system, who resigned in mid-year to accept jobs at the new academy. See *United States* v. *Tunica County School District,* 323 F. Supp. 1019 (ND Miss. 1970), aff'd, 440 F. 2d 377 (CA5 1971). As of the time of the filing of this lawsuit, the successor Tunica Institute of Learning enrolled 495 students, all white, and would not attest to an open enrollment policy. Similar histories of Holmes County, Canton Municipal Separate School District, Jackson Municipal Separate School District, Amite County, Indianola Municipal Separate School District, and Grenada Municipal Separate School District are recited, without challenge by appellees, in Brief for Appellants 14–19.

That the State's public schools are now fully unitary, as the District Court found, is irrelevant.

### IV

Appellees and the District Court also placed great reliance on our decisions in *Everson* v. *Board of Education,* 330 U. S. 1 (1947), and *Board of Education* v. *Allen,* 392 U. S. 236 (1968). In *Everson,* we held that the Establishment Clause of the First Amendment did not prohibit New Jersey from "spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools." 330 U. S., at 17. *Allen,* following *Everson,* sustained a New York law requiring school textbooks to be lent free of charge to all students, including those in attendance at parochial schools, in specified grades.

Neither *Allen* nor *Everson* is dispositive of the issue before us in this case. Religious schools "pursue two goals, religious instruction and secular education." *Board of Education* v. *Allen, supra,* at 245. And, where carefully limited so as to avoid the prohibitions of the "effect" and "entanglement" tests, States may assist church-related schools in performing their secular functions, *Committee for Public Education* v. *Nyquist, post,* at 774, 775; *Levitt* v. *Committee for Public Education, post,* at 481, not only because the States have a substantial interest in the quality of education being provided by private schools, see *Cochran* v. *Louisiana Board of Education,* 281 U. S. 370, 375 (1930), but more importantly because assistance properly confined to the secular functions of sectarian schools does not substantially promote the readily identifiable religious mission of those schools and it does not interfere with the free exercise rights of others.

Like a sectarian school, a private school—even one

that discriminates—fulfills an important educational function; however, the difference is that in the context of this case the legitimate educational function cannot be isolated from discriminatory practices—if such in fact exist. Under *Brown* v. *Board of Education,* 347 U. S. 483 (1954), discriminatory treatment exerts a pervasive influence on the entire educational process. The private school that closes its doors to defined groups of students on the basis of constitutionally suspect criteria manifests, by its own actions, that its educational processes are based on private belief that segregation is desirable in education. There is no reason to discriminate against students for reasons wholly unrelated to individual merit unless the artificial barriers are considered an essential part of the educational message to be communicated to the students who are admitted. Such private bias is not barred by the Constitution, nor does it invoke any sanction of laws, but neither can it call on the Constitution for material aid from the State.

Our decisions under the Establishment Clause reflect the "internal tension in the First Amendment between the Establishment Clause and the Free Exercise Clause," *Tilton* v. *Richardson,* 403 U. S. 672, 677 (1971). This does not mean, as we have already suggested, that a State is constitutionally obligated to provide even "neutral" services to sectarian schools. But the transcendent value of free religious exercise in our constitutional scheme leaves room for "play in the joints" to the extent of cautiously delineated secular governmental assistance to religious schools, despite the fact that such assistance touches on the conflicting values of the Establishment Clause by indirectly benefiting the religious schools and their sponsors.

In contrast, although the Constitution does not proscribe private bias, it places no value on discrimination as

it does on the values inherent in the Free Exercise Clause. Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections. And even some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment; Congress has made such discrimination unlawful in other significant contexts.[10] However narrow may be the channel of permissible state aid to sectarian schools, *Nyquist, supra; Levitt, supra,* it permits a greater degree of state assistance than may be given to private schools which engage in discriminatory practices that would be unlawful in a public school system.

## V

At oral argument, appellees expressed concern over the process of determining the scope of relief to be granted should appellants prevail on the merits. That aspect of the case presents problems but the procedural details need not be fully resolved here. The District Court's assumption that textbook loans were permissible, even to racially discriminating private schools, obviated any necessity for that court to determine whether some of the private schools could properly be classified as "racially discriminatory" and how that determination might best be made. We construe the complaint as contemplating an individual determination as to each private school in Mississippi whose students now receive text-

---

[10] See, *e. g., Griffin* v. *Breckenridge,* 403 U. S. 88 (1971); *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968); 42 U. S. C. § 2000a *et seq.* (barring discrimination in public accommodations); 42 U. S. C. § 2000e *et seq.* (barring discrimination in private employment); 42 U. S. C. § 3601 *et seq.* (barring discrimination in private housing transactions).

books under the State's textbook loan program; relief on an assumption that all private schools were discriminating, thus foreclosing individualized consideration, would not be appropriate.

The proper injunctive relief can be granted without implying a finding that all the private schools alleged to be receiving textbook aid are in fact practicing restrictive admission policies. Private schools are not fungible and the fact that some or even most may practice discrimination does not warrant blanket condemnation. The District Court can appropriately direct the appellees to submit for approval a certification procedure under which any school seeking textbooks for its pupils may apply for participation on behalf of pupils. The certification by the school to the Mississippi Textbook Purchasing Board should, among other factors, affirmatively declare its admission policies and practices, state the number of its racially and religiously identifiable minority students and such other relevant data as is consistent with this opinion. The State's certification of eligibility would, of course, be subject to judicial review.

This school-by-school determination may be cumbersome but no more so than the State's process of ascertaining compliance with educational standards. No presumptions flow from mere allegations; no one can be required, consistent with due process, to prove the absence of violation of law.

The judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN concur in the result.