**Physical Education Programs in Public Schools**

PACKEL, Attorney General, July 2, 1974.—You have asked our opinion with respect to whether certain sections of proposed State Board of Education regulations (recently circulated by the Department of Education as Basic Education Circular No. 93), which would affect physical education programs in our public schools and which would regulate in the area of intramural and interscholastic athletics, may be lawfully adopted by the board or whether such regulations are beyond the board's jurisdiction.

I. In order to answer the question you have raised, it is necessary to consider the relevant statutory background.

Section 511 of the Public School Code of March 10, 1949, P. L. 30, as amended, 24 PS §5-511, provides, in relevant part as follows:

"§5-511. Rules and regulations governing athletics, publications, and organizations

"(a) The board of school directors in every school district shall prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding (1) the management, supervision, control, or prohibition of exercises, athletics, or games of any kind, school publications, debating, forensic, dramatic, musical, and other activities related to the school program, including raising and disbursing funds for any or all of such purposes and for scholarships, and (2) the organization, management, supervision, control, fi-

nancing, or prohibition of organizations, clubs, societies and groups of the members of any class or school, and may provide for the suspension, dismissal, or other reasonable penalty in the case of any appointee, professional or other employe, or pupil who violates any of such rules or regulations.

"(b) Any school or any class activity or organization thereof, with the approval of the board, may affiliate with any local, district, regional, State, or national organization whose purposes and activities are appropriate to and related to the school program.

"(b.1) Private schools shall be permitted, if otherwise qualified, to be members of the Pennsylvania Interscholastic Athletic Association."

This section clearly reflects the basic principle, reflected throughout the 1949 School Code, see, e.g., 24 PS §§3-301 and 5-501, that the day-to-day operation and management of our public schools is vested in the governing boards of our local school districts.

But the legislature has seen fit to superimpose upon this basic governance structure an administrative body having State-wide jurisdiction in many areas relating to our public schools—namely, the State Board of Education. One of those areas is the regulation of the educational program.

Section 1327 of the School Code of October 21, 1965, P. L. 601, as amended, 24 PS §13-1327, provides, in relevant part, as follows:

"Every child of compulsory school age having a legal residence in this Commonwealth, as provided in this article, and every migratory child of compulsory school age, is required to attend a day school in which the *subjects and activities prescribed by the standards of the State Board of Education are taught in the English language.*" (Italics supplied.)

Section 1511 provides:

"§15-1511. Subjects of instruction; flag code

"In every elementary public and private school, established and maintained in this Commonwealth, the following subjects shall be taught, in the English language and from English texts: English, including spelling, reading and writing, arithmetic, geography, the history of the United States and of Pennsylvania, civics, including loyalty to the State and National Government, safety education, and the humane treatment of birds and animals, health, *including physical education*, and physiology, music and art. *Other subjects shall be taught in the public elementary schools and also in the public high schools as may be prescribed by the standards of the State Board of Education.*" (Italics supplied.)

Section 1319 of The Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §369, provides, in relevant part:

"(a) The State Board of Education shall engage in a constant review and appraisal of education in the Commonwealth. The board's evaluation shall take into account such matters as educational objectives, alternative organizational patterns, alternative programs of study, and the operating efficiency of the educational system. The chairman of the State Board of Education shall refer all studies and investigations to one of its councils as hereinafter provided, and shall receive and place on the board's agenda the findings and recommendations of the councils for appropriate action by the board.

"(b) The Council of Basic Education shall have the power, and its duty shall be to:

". . .

"(3) Investigate programs, conduct research studies and formulate policy proposals in all educational areas

not within the purview of higher education including, but not limited to,

"...

"(g) The subjects to be taught and the activities to be conducted in elementary, secondary, adult education and other schools."

Section 1317 of The Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §367, provides:

"§367. (Adm. Code §1317). The powers and duties of the State Board of Education

"(a) The State Board of Education shall have the power, and its duty shall be, to review the policies, standards, rules and regulations formulated by the Council of Basic Education and the Council of Higher Education, and adopt broad policies and principles and establish standards governing the educational program of the Commonwealth.

"...

"(b) The State Board of Education shall:

"...

"(4) Make all reasonable rules and regulations necessary to effectuate the purposes of this act and carry out all duties placed upon it by law.

"...

"(g) The State Board of Education shall make all reasonable rules and regulations necessary to carry out the purposes of this act."

Given the above language regarding the powers and responsibilities of the State board and the specific references to subjects, activities, and educational program, it is clear that those sections of the regulations dealing with "instructional programs" are within the State board's jurisdiction. Indeed, this is an area in which the board has exercised unquestioned jurisdiction for years. See, e.g., 22 Pa. Code §5.1, et seq.

It is also apparent that the sections of the proposed regulations on "intramural programs" and "interscholastic athletic programs" are within the jurisdiction of the State board carved out by the above provisions.

Firstly, the inclusion by the legislature of the word "activities" after the word "subjects" in the provisions quoted above evidences to us a clear intent that student activities must be considered part of the educational program. Intramural and interscholastic athletics are equally clearly within the classification of student activities wherever that phrase has been used.

Secondly, the operation of such athletic programs has long been considered an integral part of the educational program. As the Pennsylvania Supreme Court stated in 1938:

"Various sections of our school law recognize the scope of physical training, or education; it has for many years formed a definite and integral part of the curriculum of the public schools. Section 1607 of the Code, as amended, includes, in the course of study prescribed for the elementary public schools of the Commonwealth, instruction in 'health, including physical training,' as one of the required branches. For high schools, the State Council of Education determines the subjects to be taught based on statutory authority.

"Physical training includes organized sports and athletic exercises. Athletics are important to the moral, physical and mental development of students. In Galloway v. Prospect Pk. Boro. Sch. Dist., 331 Pa. 48, at p. 51 [200 A. 99, at page 101], Mr. Justice Stern speaking for this Court stated: 'Physical education is as much a part of the school curriculum as are subjects of intellectual study, and athletic supplies, therefore, are as "necessary for school use" as maps, globes, and similar objects. It is not the spirit of our public

school system that only children with financial means to purchase their own supplies should have the opportunity of participating in school games and athletic sports' ": Ganaposki's Case, 332 Pa. 550, 2 A. 2d 742, 744 (1938).

In that case, a properly qualified physical education instructor was assigned by the local school board to coach the basketball team and he refused, contending that coaching basketball was not an integral part of the curriculum so that he had no duty to "teach" it. In the language quoted above, the court disagreed and held that this refusal to teach was a breach of his duty toward the district and grounds for dismissal.

Finally, further support for the view that intramural and interscholastic athletic activities are an integral part of the educational program can be obtained by examining our State reimbursement system to local school districts. The basic instructional subsidy has always included payments on account of student activities which have, in turn, included interscholastic and intramural athletic activities. See §2501(11.1) of the School Code, 24 PS §25-2501(11.1), and the Pennsylvania School Accounting Manual, page 2-355 (Attachment "A").*

In summary, therefore, we have found two sources of regulatory authority relating to the school athletic

---

* We see no merit to the view propounded by the Pennsylvania Interscholastic Athletic Association as expressed on pages 5-6 of its Position Paper to the State Board of Education dated May 9, 1974, that section 511(b.1) expresses a legislative intention that PIAA exercise exclusive autonomy in the area of interscholastic athletics on behalf of local school districts. Certainly, that section recognizes, by implication, the existence and legitimacy of PIAA. We do not read the proposed regulations as preempting the PIAA or denying the legitimacy of its role in sponsoring interscholastic athletic programs.

program—one specific, i.e., section 511 of the code, and one general, i.e., the above-quoted sections relating to the powers of the State board. In our view, as explained in the next section of this opinion, the two sources are not in conflict, but, on the contrary, evidence an intent on the part of the legislature that the educational program be developed by both local governing boards and the State board. Even if one were to view the relevant sources as in potential conflict, it would, of course, be our duty to construe them, if possible, so as to give effect to both. See the Consolidated Pennsylvania Statutes of November 25, 1970, 1 Pa. S. §1933.

II. There is not, in our view, a conflict between the particular grant of authority contained in section 511 of the School Code and the general grant of authority to the State Board of Education quoted above. On the contrary, the intention of the legislature is manifest that each local governing board is given the authority and discretion to manage the day-to-day operation of our schools subject to the broad principles and standards enunciated by the State board. Such broad principles and standards provide a mechanism whereby the legislature has assured that a reasonably acceptable program of education is available to all children in Pennsylvania. Such a mechanism is particularly appropriate, furthermore, in the field of education which is fundamentally a State responsibility. See Article III, sec. 14, of the Pennsylvania Constitution.[1]

Given this framework for interaction between our local boards and the State board, we find the proposed regulations to be a proper general statement of prin-

---

[1] For a better perspective on the increase in statute and authority conferred on the State board by the Act of June 17, 1963, P. L. 143; compare especially 71 PS §§118.1, 367, 369 with the former 71 PS §§118, 357.

ciples and standards which do not unduly restrict or hamper our local boards from carrying out their day-to-day administrative and rule-making responsibilities. We find that they do provide precisely the kind of guidance and direction that the State board was created to give. Consistent with that guidance and direction, local boards are still free to determine their own policies and direction, both individually and collectively.

III. While the above sections of this opinion, in our view, adequately dispose of the issue you have raised, we feel obliged to point out that the regulations in question were designed, in part, to implement and ensure compliance with article I, sec. 28, of the Pennsylvania Constitution.

"Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."

As pointed out in section I of this opinion, the Commonwealth provides State funds for the operation of the athletic programs sought to be regulated by the State board. Depending on the aid-ratio of the particular school district, the State aid could be as high as 90 percent of the cost of the program. See section 2501(14) of the School Code, 24 PS §25-2501(14). It, therefore, seems clear that the legislature did not intend that the State board be helpless to insure that State-supported programs provide equality of opportunity to all school children, regardless of sex.[2]

---

[2] Although we do not find it necessary to address the issue in this opinion, a strong argument can be made that the Secretary of Education is under an obligation to withhold State subsidies to discriminatory programs. See Norwood v. Harrison, 93 S. Ct. 2804 (1973); Brown v. Board of Education, 347 U. S. 483 (1954). Those cases, inter alia, stand for the principle that a State may not provide significant State aid to support an unconstitutionally discriminatory program, no matter how laudatory the goals of such a

For all the foregoing reasons, it is our opinion, and you are hereby advised that the attached draft regulations would be within the lawful jurisdiction of the State Board of Education, should it decide to adopt them.

## ATTACHMENT "A"

### 1000 Series

STUDENT ACTIVITIES are classified as a function and include direct and personal services for public school pupils; such as, interscholastic athletics, entertainment, publications, clubs, band and orchestra, that are managed or operated by the student body under the guidance and direction of the faculty, not as a part of the regular instructional program, but as a part of the overall educational program of the school system.

Accounting for STUDENT ACTIVITIES involves more than one fund; namely, the General Fund and the combined Student Activities Fund(s). The Student Activities Fund may consist of several components; such as, Student Organization Fund, Athletic Fund, Merchandise Fund, Publications Fund, etc. The extent of the support of Student Activities by the Board of School Directors ranges from the assumption of responsibility for additional salaries for supervision and direction to total support from the tax resources of the school system. This assistance may be extended by providing leadership, direction, super-

---

program might be. "A State's constitutional obligation requires it to steer clear not only of operating the old dual system of racially segregated schools but also of giving significant aid to institutions that practice racial or other invidious discrimination": Norwood, supra, 41 L. W. 5098.

vision, space, facilities, supplies and equipment, and the transfer of money from the General Fund to the Student Activities Fund(s).

Accounts are provided to record salaries and other current expenses paid directly by the General Fund including recording financial assistance extended by the General Fund. However, direct expenses for Fixed Charges attributable to Student Activities are not allocated to this function, but rather to the FIXED CHARGES function. Furthermore, expenditures for the original acquisition of Student Activities equipment and other capital facilities which are paid for by the General Fund are recorded in the CAPITAL OUTLAY function.

Many Student Activities are chartered to operate as self-sustaining enterprises. However, in the course of operating the activities, some expenses attributable to Student Activities are advanced by the General Fund. If the General Fund is to be reimbursed by the Activity involved, the original expenditure should be charged to Account 3121—DUE FROM OTHER FUNDS.

The accounts in the 1000 Series of the General Fund are used only when General Fund moneys are expended for, or transferred to, any of the Student Activities Fund(s). The exceptions are Fixed Charges and Capital Outlay items as mentioned above.

Transfers of money from the General Fund to any of the Student Activities Funds are recorded as "Inter-Fund Transfers" in Account 1063—CONTRIBUTIONS TO THE STUDENT ACTIVITIES FUND(S), except if funds are loaned.

*1010 SALARIES, STUDENT ACTIVITIES*

Charge to this account full-time or prorated salaries of personnel.