# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3746

_____

James E. Stevenson, III; Sharyn Stevenson

*Plaintiff*s

Heath Adkisson; Lori Adkisson; Ryan Braswell; Melissa Braswell; Oliver
Coppedge; Tracy Coppedge; George A. Hale, III; Stephanie Hale; Jeff Langston;
Missy Langston

*Plaintiffs - Appellants*

v.

Blytheville School District #5

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: April 14, 2015
Filed: August 31, 2015

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

The Arkansas General Assembly ("General Assembly") enacted the Public School Choice Act of 2013 ("2013 Act").[1] Act 1227, 2013 Ark. Acts 1227 (Apr. 16, 2013), codified at Ark. Code Ann. § 6–18–1901 *et seq*. The 2013 Act contained a "broad school choice transfer option." *Teague v. Cooper*, 720 F.3d 973, 975 (8th Cir. 2013). But the 2013 Act also contained limitations. In relevant part, it provided that "[a] school district annually may declare an exemption under this section if the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation." Ark. Code Ann. § 6–18–1906(b)(1) (2013). The 2013 Act required a school district to "notify the [Arkansas Department of Education] by April 1" if the district intends to declare an exemption "in the next school year." *Id*. § 6–18–1906(b)(3). The "exemptions under the 2013 Act are limited to individual school districts that are subject to federal desegregation mandates." *Teague*, 720 F.3d at 977 n.2.

Heath Adkisson, Lori Adkisson, Ryan Braswell, Melissa Braswell, Oliver Coppedge, Tracy Coppedge, George A. Hale III, Stephanie Hale, Jeff Langston, and Missy Langston (collectively, "appellants") have minor children who reside within the Blytheville School District # 5 ("District"). The appellants applied to transfer their children from the District to neighboring school districts, but the District's Board of Directors subsequently adopted a resolution to exempt the District from the 2013 Act under § 6–18–1906(b) on the basis that the District "is subject to a desegregation order or mandate of a federal court of [sic] agency remedying the effects of past racial segregation." The appellants brought suit against the District, alleging that the District violated their constitutional rights when it resolved, for the 2013–2014 school year, to opt out under § 6–18–1906(b) of the 2013 Act. They sued for violations of their due process and equal protection rights under 42 U.S.C. § 1983 and for violations of

_____

[1]Portions of this introductory section are taken directly from this panel's earlier decision, *Stevenson v. Blytheville Sch. Dist. No. 5*, 762 F.3d 765 (8th Cir. 2014), without specific attribution.

the Arkansas Civil Rights Act (ACRA). As relief, the appellants requested a declaration and permanent injunction against the District, as well as damages allegedly stemming from their due process claims. The appellants also sought punitive damages for the District's allegedly race-based conduct. The appellants moved for partial summary judgment, and the District filed a counter-motion for summary judgment. The district court[2] denied the appellants' motion for partial summary judgment but granted the District's counter-motion for summary judgment. The court denied the appellants' request for a declaration, permanent injunction, and damages. On appeal, the appellants argue that the district court erred in granting summary judgment to the District because the undisputed facts show that the District (1) violated due process by abusing its power under state law and failing to provide pre-deprivation process, and (2) violated equal protection by using race as the reason for its exemption and nullifying the 2013 Act within its borders on the pretense that it was subject to a desegregation order. We affirm.

## I. *Background*
### A. *Statutory Background*

Despite containing a "broad school choice transfer option," *Teague*, 720 F.3d at 976, the 2013 Act also enabled certain resident school districts to restrict or defeat a student's ability to transfer to a nonresident district. *See* Ark. Code Ann. § 6–18–1906(a)–(b) (2013). One of those limitations set forth an exemption for a qualifying school district, providing:

> (b) (1) A school district annually may declare an exemption under this section if the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation.

---

[2]The Honorable Kristine G. Baker, United States District Court for the Eastern District of Arkansas.

(2)(A) An exemption declared by a board of directors under this subsection is irrevocable for one (1) year from the date the school district notifies the Department of Education of the declaration of exemption.

(B) After each year of exemption, the board of directors may elect to participate in public school choice under this section if the school district's participation does not conflict with the school district's federal court-ordered desegregation program.

(3) A school district shall notify the department by April 1 if in the next school year the school district intends to:

(A) Declare an exemption under this section; or

(B) Resume participation after a period of exemption.

*Id*. § 6–18–1906(b).

The General Assembly's intent was "that the 2013 Act would be effective on the date of its approval by the Governor." *Teague*, 720 F.3d at 975–76. It specifically stated its intent to dispel any "'uncertainty about the viability of [existing] transfers and future transfers'" and that the 2013 Act was "'immediately necessary to resolve the uncertainty in the law *before the 2013-2014 school year* and preserve existing student transfers.'" *Id*. at 976 (emphasis added) (quoting Act 1227, 2013 Ark. Acts 1227, § 7 (Apr. 16, 2013)). But the General Assembly enacted the 2013 Act on April 16, 2013—15 days past the April 1 deadline to declare an exemption as provided in § 6–181–906(b)(3). As a result, on May 1, 2013, the Arkansas Department of Education (ADE)[3] released a memo that stated:

---

[3]The 2013 Act provides that the "State Board of Education may promulgate rules to implement" the 2013 Act. Ark. Code Ann. § 6–18–1907 (2013).

-4-

As noted above, Act 1227 did not become effective until April 16, 2013. However, the [2013] Act sets April 1 as the date by which a school district must notify the ADE of its intention to declare an exemption for participation in public school choice under the [2013] Act. The ADE will not attempt to reestablish a deadline that is set in law. However, so school districts and the ADE can properly administer all aspects of Act 1227 in an orderly fashion and so that parents, students, patrons and school district leaders may be aware of those school districts which are subject to desegregation orders or federal agency mandates remedying the effects of past racial segregation, the ADE requests that school districts notify the ADE of any exemption by *Friday, May 17, 2013....*

Contemporaneous with notice to the ADE, the ADE also requests that school districts notify the superintendents of each of their geographically contiguous school districts of the exemption. Please note that Act 1227 does not provide the ADE the authority to rule a particular exemption valid or invalid. However, the Act does allow for such exemptions if "the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation." The ADE will post a list of school districts that declare an exemption on its website.

The 2013 Act also provided that the parents of students seeking to transfer to attend a school in a nonresident district had to submit an application to the nonresident district with a copy to the resident district on a form approved by the ADE and postmarked no later than June 1 of the year in which the student sought to begin the fall semester at the nonresident district. Ark. Code Ann. § 6–18–1905(a) (2013). By August 1 of the school year in which the student sought enrollment in a nonresident district, the superintendent of the nonresident district had to notify the parent and the resident district in writing as to whether the student's application had been accepted or rejected. *Id*. § 6–18–1905(b)(1). If the nonresident district accepted the application, then the notification letter had to include the deadline by which the student had to enroll in the nonresident district, after which the acceptance was null, and instructions for the renewal procedure that the nonresident district established.

*Id*. § 6–18–1905(b)(3). If the nonresident district rejected the application, then the notification letter had to state the reason for the rejection. *Id*. § 6–18–1905(b)(2).

Students whose applications for transfer were rejected by the nonresident district could request a hearing before the Arkansas State Board of Education ("Board of Education") to reconsider the transfer. *Id*. § 6–18–1907(b)(1). The 2013 Act required that a student request in writing an appeal hearing within ten days after the student or student's parent received the notification letter. *Id*. § 6–18–1907(b)(2)(A). "As part of the review process, the parent may submit supporting documentation that the transfer would be in the best educational, social, or psychological interest of the student." *Id*. § 6–18–1907(b)(2)(B). The Board of Education could overturn the nonresident district's decision on appeal; if it did so, then it had to notify "the parent, the nonresident district, and the resident district of the basis for the state board's decision." *Id*. § 6–18–1907(b)(3).

B. *Factual and Procedural Background*

As of April 29, 2013, appellants Heath and Lori Adkisson, Ryan and Melissa Braswell, Oliver and Tracy Coppedge, George and Stephanie Hale, and Jeff and Missy Langston were residents of and had children who resided in the District. Between April 19, 2013, and April 26, 2013, each appellant submitted an application on behalf of one of their children for transfer from the District to a nonresident district under the 2013 Act for the school year beginning in fall of 2013. Each child for whom a transfer was sought is Caucasian. The District received the appellants' applications between April 22, 2013, and April 26, 2013.

On April 29, 2013, the District met in a special session after notifying the press under the Arkansas Freedom of Information Act open-meetings law. According to the appellants, the District did not notify them of the special session. At that special meeting, the District's Board of Education adopted a resolution by a vote of six to zero to declare the District exempt under the 2013 Act. Richard Atwill,

-6-

superintendent of the District, informed the ADE of the resolution and exemption by letter dated May 9, 2013, received by the ADE on May 14, 2013.[4]

The District declared the exemption in April 2013 based in part on *Franklin v. Board of Education of Blytheville School District No. 5*, U.S.D.C. No. J–71–C–35 (E.D. Ark.). The history of the *Franklin* litigation begins on July 19, 1968, when the Regional Director of the Office of Civil Rights at the United States Department of Health, Education, and Welfare (HEW) sent a letter to the District approving the district's "plan for the complete elimination of the dual school system in the Blytheville Public Schools."

According to the District's plan, the "District was to be completely desegregated by the beginning of the 1970–71 school year." But the HEW's onsite audit of the District

> on October 6, 1970, revealed that [the District's] commitment to a desegregated system had not been implemented in that the Robinson and Franklin Elementary Schools remain[ed] identifiably Negro schools. Under the freedom of choice plan which [was] still in [the District's] elementary schools, there [were] no white students in either of these schools.

Based on the audit, the Director of the Office for Civil Rights of the HEW sent a letter to the District on February 11, 1971, confirming that "because of the failure of the [District] to convert to a unitary school system the matter was being referred to [the Department of Justice (DOJ)] with a recommendation that appropriate enforcement action be initiated." On May 12, 1971, the District requested "a one-year

---

[4]On March 31, 2014, the District renewed its claim of exemption under the 2013 Act.

continuance of the present freedom of choice plan of school desegregation for the elementary schools in the [District]."

On June 18, 1971, the DOJ denied the District's request, stating that the DOJ was "unable to approve the [D]istrict's continued operation under a freedom of choice plan of school desegregation." According to the DOJ, six elementary schools within the District contained five racially identifiable white or black schools. It explained that school desegregation could not be delayed because of "possible community opposition to a change in the elementary school structure." The DOJ gave the District ten days within which to advise the DOJ of "what plans the Blytheville School Board has taken and what procedures have been adopted to [e]nsure that such plans will be implemented at the beginning of the 1971–72 school year, for full conversion of the [District] to a unitary non-racial system." The DOJ expressed its "hope that the Blytheville School Board w[ould] not delay in [its] obligation to convert to a unitary system and that compliance c[ould] be brought about by voluntary means rather than by resort to the coercion of the courts."

Nonetheless, litigation ensued, as African-American parents filed suit on July 7, 1971, against the District seeking to enjoin the District from continuing to operate a dual school system and to require it to implement a unitary school system. *See Franklin*, U.S.D.C. No. J–71–C–35. On August 19, 1971, the district court in *Franklin* entered an order approving the District's desegregation plan, with the exception of certain identified issues, ending its "freedom of choice" plan that was previously rejected by the HEW and the DOJ.

On May 31, 1973, the HEW sent a letter to the ADE advising that the HEW had reviewed the district court's desegregation order, as well as the District's assurance of compliance with that order, and determined that "[t]he documents [were] adequate" to satisfy Title VI requirements "for the purpose of approving applications and plans for continued participation in Federal programs." But the HEW made clear

-8-

that it had not considered the merits of the District's desegregation plan and advised that,

> [i]n an appropriate proceeding, either the Government or a private party may seek modifications of the desegregation plan or take other action as it may deem necessary. The school district must modify its plan as ordered by the court to remain in compliance. Your office and the school board are requested to keep the Office for Civil Rights informed of any appeals from or modification of the court order.

On June 21, 1973, the district court entered an order closing the case but retaining jurisdiction. The district court stated in this order that,

> [o]n the basis of correspondence with counsel for the parties, the Court concludes that issues reserved in the Court's order [approving the District's desegregation plan] are no longer a subject of controversy. There being no pending issues in this preceding, it is ordered that this case be, and it is hereby, closed but that the Court retain jurisdiction of this cause and of the parties hereto for necessary and appropriate purposes.

On December 6, 1978, the district court entered an order dismissing the case because, since closing it, "the Court ha[d] received no further communication concerning this case." Three days later, on December 9, 1978, plaintiffs' counsel sent the district court a letter that stated:

> The Court sua[]sponte closed this case. I am writing to remind the Court that there is no finding by the Court that a unitary school system has been achieved, and there is no order requiring the school district to hereafter maintain an integrated system in all respects. Finally, the Court did not award the prevailing parties appropriate costs and counsel fees.

With respect to the establishment of a unitary school system, I think the obligation of the Court is to make some further inquiry and to also [e]nsure that faculty and staff desegregation principles are clearly expressed.

I am bringing these matters to the Court's attention in the hope that the Court will rescind its order and judgment filed December 7 and substitute an order requiring the defendants to provide the Court something in the nature of a comprehensive final report which relates to students, staff, programs and facilities.

The district court in *Franklin* took no further action.

The appellants filed this action on May 20, 2013, alleging that the District violated their constitutional rights when it resolved, for the 2013–2014 school year, to opt out under § 6–18–1906(b) of the 2013 Act. They sued for violations of their due process and equal protection rights under 42 U.S.C. § 1983 and for violations of the ACRA. As relief, the appellants requested a declaration and permanent injunction against the District, as well as damages allegedly stemming from their due process claims and punitive damages for the District's allegedly race-based conduct.

The appellants also sought a preliminary injunction requiring the District to rescind its resolution declaring the exemption for the 2013–2014 school year under the 2013 Act. The district court denied the preliminary injunction, and the appellants appealed. We dismissed the appeal as moot given the "clear terms of the motion," which provided that the motion pertained to the 2013–2014 school year. *Stevenson*, 762 F.3d at 770.

Thereafter, the appellants moved for partial summary judgment on their claims, and the District moved for summary judgment on all claims. The district court denied the appellants' motion for partial summary judgment but granted the District's

counter-motion for summary judgment. The court denied the appellants' request for a declaration, permanent injunction, and damages.

## II. *Discussion*

On appeal, the appellants argue that the district court erred in granting summary judgment to the District because the undisputed facts show that the District (1) violated their due process rights by abusing its power under state law and failing to provide pre-deprivation process, and (2) violated their equal protection rights by using race as the reason for its exemption and nullifying the 2013 Act within its borders on the pretense that it was subject to a desegregation order.[5]

### A. *Mootness*

As a preliminary matter, we must address whether the current appeal is moot in light of recent events. Prior to oral argument, the Arkansas General Assembly passed Act 560, which became law on March 20, 2015. The statute amends the 2013 Act, striking former § 6-18-1906(b), the section at issue in this appeal, and adding § 6-13-113, which provides:

---

[5]The Arkansas Constitution secures the right to not be deprived of any right, privilege or immunity on account of race. Ark. Const. Art. 2, § 3. The ACRA also enables a cause of action for legal and equitable relief for state constitutional violations. Ark. Code Ann. § 16-123-101, *et seq*. "When construing [the ACRA], a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act of 1871, as amended and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which decisions and act shall have persuasive authority only." Ark. Code Ann. § 16-123-105(c). Based on § 16-123-105(c), the appellants advise that "they have analyzed their § 1983 and ACRA claims together for purposes of this appeal." We, too, will analyze the appellants' § 1983 and ACRA equal protection and due process claims together.

(a) By January 1, 2016, a school district that is subject to a desegregation order or desegregation-related order shall notify the Department of Education in writing.

(b) A school district that is subject to a desegregation order or a desegregation-related order shall include in the written notice to the department:

(1) A copy of the desegregation order or desegregation-related order;

(2) The case heading and case number of each court case in which the order was entered;

(3) The name and location of each court that maintains jurisdiction over the order; and

(4) A description of the school choice student transfer desegregation obligations, if any, that the school district is subject to, related to the order.

(c) A school district that is released from court supervision related to a desegregation order or desegregation-related order shall promptly notify the department.

(d) A school district that fails to meet the requirements of this section is in violation of the Standards for Accreditation of Arkansas Public Schools and School Districts.

(e) The department shall post on the department's website all written notifications received as required by this section.

Ark. Code Ann. § 6-13-113 (2015).

Following oral argument, on April 22, 2015, the District sent a letter to the ADE claiming the exemption under § 6-13-113, explaining that it

-12-

is a party to the following desegregation lawsuits that are still active: mandates issued in 1971 by the U.S. Department of Justice and the U.S. Department of Health, Education and Welfare; *Franklin, et al. v. Blytheville School District No. 5*, U.S.D.C. No. J-71-C-35; and *Harvell, et al. v. Blytheville School District et al.*, U.S.D.C. No. J-C-89-225, 126 F.3d 1038 (8th Cir. 1997). The desegregation obligations of these cases prohibit the District from taking any action, or refraining from taking any action, the natural and probable consequence of which would be a segregative impact within the District (*i.e.*, the creation, maintaining, or increasing of racially identifiable schools). Permitting school choice under the Acts would have such an impact. Allowing school choice would, therefore, be in conflict with the District's desegregation obligation still outstanding. The District further relies upon Ark. Code Ann. § 6-18-317(a), which prohibits transfers if either the resident or residing district has ever been under a desegregation-related court order. *See Edgerson on behalf of Edgerson v. Clinton*, 86 F.3d 833 (8th Cir. 1996).

"[C]ourts distinguish between claims seeking declaratory and injunctive relief, which may be mooted by the repeal of a statute, and claims seeking monetary relief, which generally are not mooted." *Tini Bikinis-Saginaw, LLC v. Saginaw Charter Tp.*, 836 F. Supp. 2d 504, 520 (E.D. Mich. 2011). "'We can neither declare unconstitutional nor enjoin the enforcement of a provision that is no longer in effect.'" *Id*. (quoting *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004)). But "plaintiffs' claim for money damages [is] not moot" where "the plaintiffs could seek damages" caused by a statutory violation. *Id*. (citing *Brandwyine*, 359 F.3d at 836 ("Plaintiffs' claim for monetary damages, however, was not properly dismissed as moot, because an award of monetary damages would compensate plaintiffs for the loss of the opportunity to engage in protected expression caused by the enforcement of the zoning scheme.")).

Given that the Arkansas General Assembly has amended the 2013 Act, striking § 6-18-1906(b), and that the District has claimed an exemption under the newly added

§ 6-13-113, the appellants' request for declaratory and injunctive relief as it pertains to the 2013 Act is moot. But the appellants could potentially recover money damages for any constitutional violation arising from the District's alleged violation of the 2013 Act; therefore, the money-damages claims are not moot; accordingly, we address the appellants' underlying due process and equal protection claims.

## B. *Constitutional Claims*

"We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to [the appellants] and drawing all reasonable inferences in [their] favor." *Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014) (citation omitted).

The appellants' due process and equal protection claims are premised on the District's purported taking of the exemption in violation of the 2013 Act. But "violations of state laws . . . do not by themselves state a claim under 42 U.S.C. § 1983. Section 1983 guards and vindicates federal rights alone." *Ebmeier v. Stump*, 70 F.3d 1012, 1013 (8th Cir. 1995); *see also Williams v. Hopkins*, 130 F.3d 333, 337 (8th Cir. 1997) ("Ordinarily, an alleged violation of state law does not by itself state a claim redressable by a § 1983 action.").

> It is established beyond peradventure that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim. Although it is true that constitutional significance may attach to certain interests created by state law, not every transgression of state law does double duty as a constitutional violation.

*Ebmeier*, 70 F.3d at 1013 (quotation, citation, and footnote omitted).

"We must be extremely careful in examining claimed violations of state laws . . . . Only in very limited and obvious circumstances will federal constitutional

-14-

significance attach in these matters." *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1312 (8th Cir. 1997). Therefore, we now examine whether the District's purported violation of the 2013 Act violates the appellants' due process or equal protection rights.

## 1. *Due Process*

The Due Process Clause of the Fourteenth Amendment provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "This clause has two components: the procedural due process and the substantive due process components." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (en banc) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)). Here, the appellants proceed only on their procedural due process claim.

> To make out a claim for a violation of procedural due process, the plaintiff has the burden of showing that "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest."

*EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (footnote omitted) (quoting *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)).

### a. *Liberty Interest*

The appellants first argue that they have a protected liberty interest in directing the education of their children and that they were deprived of this interest by the District's adoption of the resolution. The district court rejected the appellants' argument, concluding that "[t]he fundamental rights and liberties plaintiffs claim here exceed that which the Supreme Court has recognized." The district court found no

cases "holding a parent's ability to choose where his or her child is educated within the public school system is a fundamental right or liberty."

"In [*Washington v.*] *Glucksberg*, the Supreme Court articulated the fundamental rights protected by the Due Process Clause." *Combs v. Home-Ctr. Sch. Dist.*, 540 F.3d 231, 247 (3d Cir. 2008) (per curiam) (citing *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997)). The Supreme Court "[i]ncluded in the list . . . the right 'to direct the education and upbringing of one's children.'" *Id*. (quoting *Glucksberg*, 521 U.S. at 720 (citing *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (holding state law prohibiting foreign language instruction violated the "power of parents to control the education of their own"); *Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (holding state compulsory education law requiring students to attend solely public schools "unreasonably interferes with the liberty of parents . . . to direct the upbringing and education of children under their control"))).

"Although [the appellants] assert the fundamental nature of their general right, it is a limited one." *Id*. As the Third Circuit has recognized,

> "[t]he Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education. It is clear, however, that the right is neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). "The case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson* [*v. Guthrie Indep. Sch. Dist. No. I-L*,] 135 F.3d [694,] 699 [(10th Cir. 1998)].

*Id*. at 247–48 (first alteration in original) (footnote omitted).

-16-

Here, as happened in *Combs*, the appellants rely "on *Meyer* and *Pierce* for foundational support." *Id*. at 248.

> In *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, the Court held that the liberty protected by the Due Process Clause of the Fourteenth Amendment includes the right "to acquire useful knowledge, to marry, establish a home and bring up children," *Id*., at 399, 43 S. Ct., at 626, and, concomitantly, *the right to send one's children to a private school that offers specialized training* in that case, instruction in the German language. In *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, the Court applied "the doctrine of *Meyer v. Nebraska*," *Id*., at 534, 45 S. Ct., at 573, to hold unconstitutional an Oregon law requiring the parent, guardian, or other person having custody of a child between 8 and 16 years of age *to send that child to public school* on pain of criminal liability. The Court thought it "entirely plain that the (statute) unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id*., at 534–535, 45 S. Ct., at 573. In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15, the Court stressed the *limited scope* of *Pierce*, pointing out that it lent "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society" but rather "held simply that while a State may posit (educational) standards, it may not pre-empt the educational process *by requiring children to attend public schools*." *Id*., at 239, 92 S. Ct., at 1545 (White, J., concurring). And in *Norwood v. Harrison*, 413 U.S. 455, 93 S. Ct. 2804, 37 L. Ed. 2d 723, the Court once again stressed the "*limited scope* of *Pierce*," *Id*., at 461, 93 S. Ct., at 2809, which simply "affirmed the right of private schools to exist and to operate . . . ." *Id*., at 462, 93 S. Ct., at 2809.

*Runyon v. McCrary*, 427 U.S. 160, 176–77 (1976) (alteration in original) (emphases added).

In summary, *Meyer* and *Pierce* stand for the proposition that "[t]he Fourteenth Amendment prevents a state from denying parents *the right to choose private schools* for their children's education." *Pelletier v. Me. Principals' Ass'n*, 261 F. Supp. 2d 10, 13 (D. Me. 2003) (emphasis added) (citing *Pierce*, 268 U.S. at 534–35; *Meyer*, 262 U.S. at 399–400). Here, the District "has not restricted the [appellants'] constitutional right to educational choice. The [appellants] are free to send [their children] to public school, or to send them to . . . private school, or to educate them at home. They have freely chosen [to send their children to public school]." *Id.* We agree with the district court that neither *Meyer*, *Pierce*, nor any other relevant precedent support the proposition that "a parent's ability to choose where his or her child is educated *within the public school system* is a fundamental right or liberty." *Adkisson v. Blytheville Sch. Dist. No. 5*, No. 3:13–cv–00127–KGB, 2014 WL 6819729, at \*15 (E.D. Ark. Dec. 2, 2014) (emphasis added). Accordingly, the appellants have failed to prove that they have a protected liberty interest.

### b. *Property Interest*

The appellants next argue that the 2013 Act creates a protected property interest in public school choice. According to the appellants, § 6-18-1906(b) set forth limits on the District's ability to claim an exemption and those limits were part of their property interest. They contend that the District denied them this "state-defined property interest by defying the April 1 deadline and claiming the exemption based on a case to which [the District] has not been subject for more than 35 years."

> To have a constitutionally cognizable property interest in a right or a benefit, a person must have "a legitimate claim of entitlement to it." *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The Due Process Clause does not create any property interest; it merely protects property rights arising "from an independent source such as state law." *Id.* A property interest arises when state law creates "expectations that are 'justifiable.'" *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 796, 100 S. Ct. 2467,

65 L. Ed. 2d 506 (1980) (quoting *Vitek v. Jones*, 445 U.S. 480, 489, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980)). No property interest arises where the statutory claim to a benefit is "too ephemeral and insubstantial." *Id*. (quoting *Meachum v. Fano*, 427 U.S. 215, 228, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976)) (internal quotation marks omitted).

*Austell v. Sprenger*, 690 F.3d 929, 935 (8th Cir. 2012); *see also Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 720 (8th Cir. 1996) ("For a property interest to arise, a government employee must have a 'legitimate claim of entitlement' to continued employment, as opposed to a mere subjective expectancy." (quoting *Roth*, 408 U.S. at 577)).

Although a state "may not be constitutionally obligated to establish and maintain a public school system," once it has done so, "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). *Goss* involved the interference with students' legitimate entitlement to a public education resulting from the students' suspension. *Id*. at 579 ("At the very minimum, . . . students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing"). The Court characterized the students' interest as "avoid[ing] unfair or mistaken exclusion from the educational process." *Id*.; *see also id*. at 581 ("The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." (footnote omitted)). "Therefore, under *Goss*, the property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process." *Mazevski v. Horseheads Cent. Sch. Dist.*, 950 F. Supp. 69, 72 (W.D.N.Y. 1997). Here, as the district court found, the appellants "have not been excluded from the educational process," as the District has not prevented them from attending public school. *Adkisson*, 2014 WL 6819729, at *16.

Furthermore, we agree with the district court that "the 2013 Act does not create a property interest in exercising public school choice because plaintiffs do not have more than a mere subjective expectancy of school choice under the 2013 Act." *Id*. (citation omitted). "A protected property interest is a matter of state law involving 'a legitimate claim to entitlement as opposed to a mere subjective expectancy.'" *Snaza v. City of Saint Paul, Minn.*, 548 F.3d 1178, 1182–83 (8th Cir. 2008) (quoting *Bituminous Materials, Inc. v. Rice Cnty.*, 126 F.3d 1068, 1070 (8th Cir. 1997)). "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (alteration in original) (quoting *Roth*, 408 U.S. at 577). But "*federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 757 (2005) (quotations and citations omitted). An "entitlement" is defined as "[a]n *absolute right* to a . . . benefit . . . granted immediately upon meeting a legal requirement." Black's Law Dictionary 612 (9th ed. 2009) (emphasis added).

Here, the 2013 Act "enable[d] a student to attend a school in a nonresident district, subject to the limitations under § 6-18-1906." Ark. Code Ann. § 6-18-1903(a) (2013). It required each school district to "adopt by resolution specific standards for acceptance and rejection of applications." *Id*. § 6-18-1903(d)(1). In setting forth its standards, the Act permitted school districts to "include without limitation the capacity of a program, class, grade level, or school building." *Id*. § 6-18-1903(d)(2)(A). The 2013 Act required school districts to give priority to applicants with siblings or stepsiblings residing in the same household who were "already enrolled in the nonresident district by choice." *Id*. § 6-18-1903(d)(2)(B)(i)–(ii). In setting forth standards, the 2013 Act prohibited school districts from considering an applicant's academic achievement, athletic ability, extracurricular ability, English proficiency level, and prior disciplinary record. *Id*. § 6-18-1903(d)(2)(C)(i)–(iv). Nor

did the 2013 Act permit school districts to discriminate "on the basis of gender, national origin, race, ethnicity, religion, or disability" in evaluating a transfer application. *Id*. § 6-18-1903(d)(3). The 2013 Act directed nonresident districts to notify an applicant and the resident district in writing as to whether the nonresident district had accepted or rejected the application by August 1 of the school year in which the applicant sought to enroll. *Id*. § 6-18-1905(b)(1). If the nonresident district rejected the application, it had to "state in the notification letter the reason for rejection." *Id*. § 6-18-1905(b)(2).

In summary, although the 2013 Act prohibited nonresident school districts from considering certain characteristics of an applicant, it still invested the nonresident school district with the discretion to decide whether to accept a student seeking transfer. *Cf. Horton v. City of Smithville*, 117 F. App'x 345, 347–48 (5th Cir. 2004) ("[D]iscretionary statutes do not give rise to constitutionally-protected property interests." (footnote omitted)). Thus, as the district court recognized, *even if the District had not taken the exemption*, "nonresident districts retained discretion on whether to accept students seeking to transfer." *Adkisson*, 2014 WL 6819729, at *16.

In fact, the appellants concede that "[t]he 2013 Act does not guarantee that an application for transfer will be accepted." Nevertheless, they argue that their "property interest does not hinge on the prospect of acceptance by the nonresident district" but instead "stems from their right of access to the educational process, including their right to seek other educational opportunities for them, whether within [the District] or elsewhere." According to the appellants, the District eliminated their ability to exercise their right by illegally claiming an exemption under the 2013 Act. But the appellants' argument misses the mark. In reviewing whether the appellants have a protected property interest, we must examine what the 2013 Act provides to the appellants. And, by its plain language, what it provides to them is the *possibility* of transfer to another district, not a guarantee or absolute right to transfer.

Accordingly, the appellants have failed to prove that they have a protected property interest, and their procedural due process claim necessarily fails.[6]

### 2. *Equal Protection*

The appellants argue that the District "violated equal protection by using race as the reason for its exemption and nullifying the 2013 Act within its borders on the pretense that it is subject to *Franklin*, which is irrational and capricious." The appellants argue that strict scrutiny applies because race clearly played a part in the District's exemption decision. Alternatively, the appellants argue that even if race played no part in the District's exemption decision, the District's decision has no rational basis.

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted). Strict scrutiny applies to state action where "a State treats persons differently based on a suspect classification, such as race." *Exec. Air Taxi Corp. v. City of Bismark, N.D.*, 518 F.3d 562, 566 (8th Cir. 2008). But if "no suspect classification is involved, . . . the State need only show that the differential treatment is rationally related to a legitimate state interest." *Id*. (citation omitted).

### a. *Strict Scrutiny*

We will review the District's facially neutral action of claiming an exemption under the 2013 Act "under strict scrutiny only if it can be proved that the [action] was motivated by a racial purpose or object, or if it is unexplainable on grounds other than

---

[6]Having concluded that the appellants do not have a constitutionally protected liberty or property interest, we need not address the remaining elements of their procedural due process claim.

race." *Friends of Lake View Sch. Dist. Incorp. No. 25 of Phillips Cnty. v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009) (quotations and citations omitted). "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977) (citing *Washington v. Davis*, 426 U.S. 229 (1976)). But "an allegation of disproportionate impact 'is only relevant to the extent that it 'reflects a discriminatory purpose.''" *Friends of Lake View*, 578 F.3d at 761 (quoting *Ricketts v. City of Columbia*, 36 F.3d 775, 781 (8th Cir. 1994) (quoting *Davis*, 426 U.S. at 239)). "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Vill. of Arlington Heights*, 429 U.S. at 265–66 (footnote omitted). Only in "exceeding rare cases" will "'a clear pattern, unexplainable on grounds other than race, emerge[] from the effect of the state action even [though] the governing [action] appears neutral on its face.'" *Friends of Lake View*, 578 F.3d at 762 n.12 (second alteration in original) (quoting *Vill. of Arlington Heights*, 429 U.S. at 266).

The appellants first argue that they have provided direct evidence of racial discrimination to justify use of strict scrutiny and a consequent finding of an equal-protection violation. In support of their argument, the appellants cite the testimony of the District's superintendent at the hearing on the appellants' motion for preliminary injunction. At that hearing, the superintendent explained that he recommended that the District opt out of the 2013 Act based on his "opinion that the district was still part of a desegregation order." When asked how he formed that opinion, the superintendent responded, "By looking back over some archival data that we have in the district from past cases and from some law history," which included the *Franklin* case. The superintendent testified that he reviewed this "archival information" in 2013 *and* 2012. When asked why he reviewed the information "in 2012," the superintendent replied:

*In the past*, the State of Arkansas had school choice, but due to the desegregation order, white students—we couldn't upset the racial balance. *As the old law was*, we couldn't upset the racial balance of the school district, therefore, white students were not allowed to transfer out and black students were not allowed to transfer in. Black students could transfer out, white students could transfer in, but—so I tried to keep up on the information from the past to watch the trends.

(Emphases added.)

We conclude that the superintendent's testimony is not direct evidence of racial animus. We agree with the district court that "the superintendent was speaking to the manner in which the previous school choice statute was worded and how it was implemented, not the requirements of *Franklin* or the 2013 Act." *Adkisson*, 2014 WL 6819729, at *8 (quotation and citation omitted).

The appellants next argue that they presented evidence of disparate impact and purpose based on race. This evidence relates to the Board of Education's approval in 2009 of an open-enrollment charter school—KIPP Delta Academy (KIPP). KIPP educates about 250 students, most of whom come from the District and the majority of whom are African American or other minorities. KIPP must admit all applicants who apply, unless there are more applicants than spaces, in which case KIPP must fill spaces according to a random, anonymous lottery.

Arkansas Code Annotated § 6-23-106 provides:

(a) The applicants for a public charter school, *the local school district board of directors for the district in which a proposed public charter school would be located*, and the [Board of Education] shall carefully review the potential impact of an application for a public charter school on the efforts of a public school district or public school districts *to*

*comply with court orders* and statutory obligations to create and *maintain a unitary system of desegregated public schools*.

(b) The [Board of Education] shall attempt to measure the likely impact of a proposed public charter school on the efforts of public school districts to achieve and maintain a unitary system.

(c) The [Board of Education] shall not approve any public charter school under this chapter or any other act or any combination of acts that hampers, delays, or in any manner negatively affects the desegregation efforts of a public school district or public school districts in this state.

(Emphases added.)

The appellants argue that despite § 6-23-106(a) and the District's admitted review of "the KIPP Delta applications to operate and expand in Blytheville," the District "did not claim interference with desegregation efforts when black students transferred out to KIPP Delta's campus in Blytheville." According to the appellants, "most of the 250 students who transferred into KIPP Delta in Blytheville came from [the District]," and "[t]he overwhelming majority of children at KIPP Delta in Blytheville are black."

We first note that the approval of KIPP occurred "under laws different than those being discussed here." *Stevenson v. Blytheville Sch. Dist. No. 5*, 955 F. Supp. 2d 955, 968 (E.D. Ark. 2013). Although the District was one of the parties with the responsibility of "review[ing] the potential impact of an application for a public charter school on the efforts of a public school district or public school districts to comply with court orders," Ark. Code Ann. § 6-23-106(a), it was the *Board of Education* that ultimately approved KIPP, *id*. § 6-23-106(c). At the preliminary-injunction stage, the District's superintendent "testified that the Blytheville District's involvement in the charter school review process is different than the Blytheville District's involvement in implementing the 2013 Act." *Stevenson*, 955 F. Supp. 2d at

-25-

968–69. Neither at the preliminary-injunction stage or now have the appellants presented any evidence to contradict the superintendent's statement. *Id*. ("Plaintiffs presented no testimony or evidence to the contrary.").[7]

Furthermore, the *undisputed fact* is that the District did not attempt to block *any* transfers of *any* children, *regardless of race*, to KIPP on the basis of any alleged desegregation order or remedy, such as *Franklin*. Thus, as the district court observed, "[a]ll [District] students, *regardless of race*, had an *equal opportunity* to transfer to KIPP, just as no [District] students could transfer under the 2013 Act." *Adkisson*, 2014 WL 6819729, at *6 (emphases added). As the district court observed, the appellants have presented no record evidence that the District "permitted African American but not Caucasian students to transfer out of the district." *Id*. (citation omitted). Thus, this is not a case in which the District was "distribut[ing] burdens or benefits on the basis of individual racial classifications." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). We agree with the district court that the District's adoption of "the resolution exempting itself from the 2013 Act

---

[7]As the district court noted in its order denying the motion for preliminary injunction:

> Plaintiffs did submit a March 1, 2013, Memo to the State Board of Education from the Arkansas Department of Education staff which stated: "The Arkansas Department of Education is unaware of any pending desegregation orders or decrees affecting either [the Blytheville District or Helena–West Helena District]" (Hearing Ex. 1; Dkt. No. 19–1, at 2). Mr. Atwill testified that, based on conversations he had with a representative of the Equity Department at the Arkansas Department of Education, he disagreed with this characterization. He also questioned what information the Arkansas Department of Education reviewed before making the statement.

*Stevenson*, 955 F. Supp. 2d at 969 (alteration in original).

impacted Caucasian and African American students alike." *Adkisson*, 2014 WL 6819729, at *7.

As a result, we, like the district court, conclude that the appellants have failed to prove a disparate purpose in claiming the exemption and that strict scrutiny does not apply. Therefore, we necessarily address the appellants' alternative rational-basis argument.

b. *Rational Basis*

Under rational basis, the appellants "must prove [that they] w[ere] *treated differently* by the [District] than similarly situated persons and the *different treatment* was not rationally related to a legitimate government objective." *Koscielski v. City of Minneapolis*, 435 F.3d 898, 901 (8th Cir. 2006) (emphases added) (citations omitted); *see also Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009) ("To establish a violation of the Equal Protection Clause . . . , [the plaintiff] must show that he was treated differently than other persons who were 'in all relevant respects similarly situated.'" (citation omitted)). "To demonstrate this, [the appellants] must prove similarity to other individuals . . . receiving *favorable treatment*." *Koscielski*, 435 F.3d at 901 (emphasis added) (citations omitted).

The appellants argue that the District treated them differently because it allowed intra-district transfers to KIPP but denied the appellants inter-district transfers under the 2013 Act. But, as explained *supra*, "[a]ll [District] students, *regardless of race*, had an *equal opportunity* to transfer to KIPP, just as no [District] students could transfer under the 2013 Act." *Adkisson*, 2014 WL 6819729, at *6 (emphases added). We emphasize the lack of *any* evidence that the District "permitted African American but not Caucasian students to transfer out of the district." *Id*. The District's claim of the exemption equally impacted all students, regardless of race, as no student could transfer out of the District because of the District's taking of the exemption under the 2013 Act.

-27-

Alternatively, even assuming that differential treatment exists upon which to base an equal protection claim, we conclude that the District had at least a rational basis for believing that the 2013 Act authorized it to take the exemption. First, the District could rationally believe that it submitted timely notice of the exemption in accordance with the 2013 Act. While the 2013 Act did require the District to "notify the [ADE] by April 1 if in the next school year the school district intend[ed] to" declare an exemption, Ark. Code Ann. § 6-18-1906(b)(3), the 2013 Act did not become effective until April 16, 2013. As we recognized in *Teague*, the General Assembly's intent was "that the 2013 Act would be effective on the date of its approval by the Governor." 720 F.3d at 975–76. Because of the purported ambiguity regarding whether exemptions were available to school districts for the 2013–14 school year, the ADE "request[ed] that school districts notify the ADE of any exemption by *Friday, May 17, 2013*, so that the "ADE [could] properly administer all aspects of Act 1227 in an orderly fashion." The District declared its exemption on April 29, 2013, prior to the issuance of the ADE Memo, but the ADE Memo sets forth the rational basis upon which the District could have also believed that its taking of the exemption for the 2013–14 school year was timely.

Second, while we decline to hold as a matter of law that the District "is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation," Ark. Code Ann. § 6-18-1906(b)(1), we do hold that the District at least had *a rational basis for believing* that it "is subject to the . . . mandate of a federal court or agency."[8] *See id*. Although the district court entered an order dismissing the *Franklin* case on December 6, 1978, the District "views the commands set out in the HEW letter [of May 31, 1973] as a *mandate by a federal agency* that it cannot return to the dual school system perpetuated by the 'freedom of

---

[8]We decline to address whether the District had a rational basis for believing that it is currently "subject to [a] desegregation order." *See id*.

choice' plan, which Judge Eis[e]le dismantled in 1971." (Emphasis added.) The District argues that not taking the exemption under the 2013 Act could potentially "dismantle the mandates of" the DOJ, HEW, and *Franklin* judgment "by returning North Mississippi County to a freedom of choice system, thereby resegregating the school systems."

We conclude that the District could reasonably read the HEW's letter as a federal-agency mandate upon the District to take no action that could result in the District returning to the dual-school system dismantled by the *Franklin* litigation.[9] While the HEW letter specifically stated that the District at that time was "meet[ing] the requirements of Title VI . . . for the purpose of approving applications and plans for continued participation in Federal programs," it also indicated that

> [i]n an *appropriate proceeding*, either the Government or a private party may seek modifications of the desegregation plan *or take other action as it may deem necessary*. The school district must modify its plan as ordered by the court to *remain in compliance*. Your office and the school board are requested to keep the Office for Civil Rights informed of any appeals from or modification of the court order.

(Emphases added.)

For the aforementioned reasons, we hold that the District's taking of the exemption under the 2013 Act survives rational-basis review. *See Vasquez-Velezmoro v. United States I.N.S.*, 281 F.3d 693, 697 (8th Cir. 2002) ("The government's different treatment of persons will 'be upheld against equal protection challenge if

---

[9]We, as did the district court, reject the argument that the District "was required to distinguish between intradistrict and interdistrict desegregation orders when determining whether it could adopt the resolution exempting [the District] from the 2013 Act" because the 2013 Act "does not require such an analysis or differentiate between these types of desegregation orders." *Adkisson*, 2014 WL 6819729, at *14.

there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (quoting *FCC v. Beach Commc'n, Inc.*, 508 U.S. 307, 313 (1993)).

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

BEAM, Circuit Judge, concurring and dissenting.

I concur in the court's general explication concerning the former, and partly applicable, terms and conditions of the "broad school choice transfer option[s]," Teague v. Cooper, 720 F.3d 973, 975 (8th Cir. 2013), contained in Arkansas Code Annotated §§ 6-18-1901 et seq., the Public School Choice Act of 2013 (the 2013 Act). I also concur in the court's conclusion that a portion of this appeal was mooted by the Arkansas General Assembly's repeal of former § 6-18-1906(b), the transfer exemption portion of the 2013 Act, upon its enactment of Arkansas Code Annotated § 6-13-113.

I likewise agree with the court's conclusion that notwithstanding this recent legislative revocation, the appellants remain positioned, upon presentation of satisfactory proof, to recover money damages, costs and fees arising from the purposeful and unconstitutional pre-repeal misuse by the Blytheville School District (the "Blytheville District") of the school choice transfer exemption clause, the now abolished § 6-18-1906(b). The 2013 Act remains continuingly viable and fully relevant for purposes of finding and calculating appellants' damages. The constitutionally protected rights at issue include statutorily enforceable property interests in matters of public school choice as well as equal protection violations arising through the unlawful and unconstitutional use of the previously existing school district transfer exemption apparatus.

-30-

I disagree, however, with the court's conclusions that the appellants have failed to prove these constitutional violations. To the contrary, the appellants successfully establish both procedural due process and equal protection claims. Accordingly, I would remand the case to the district court to determine all necessary legal and factual issues concerning liability and monetary damages.

I.

I turn first to an analysis of the specific constitutional claims advanced by the appellants. I agree with the court that the appellants fail to prove they have a protected liberty interest. But, the appellants fully succeed on their procedural due process claim, as the 2013 Act clearly created a protected tangible property interest in public school choice and attendance in Arkansas. The court found that appellants did not have a property interest in public school choice because the property interest defined in Goss v. Lopez, 419 U.S. 565 (1975), was "the right to participate in the entire educational process and not the right to participate in each individual component of that process." Ante at 19 (quotation omitted). In support, the court says the appellants "have not been excluded from the educational process" as they were not prevented from attending public school. Id. (quotation omitted). However, the Legislature of Arkansas statutorily created a much more specific property interest, not just an interest in public school services for the parent and child somewhere in the State of Arkansas. The 2013 Act created for the nonresident district applicant a school of the parent and student's "choice" in another Arkansas district. See Goss, 419 U.S. at 572 (stating that protected interests in property are created by "an independent source such as state statutes or rules"). Unfortunately, the court attempts to use the statute's exemption clause to improperly slice and dice the

-31-

relevant property interests created by Goss and the 2013 Act, using inapposite district court precedent to support its incorrect conclusion.[10]

The 2013 Act created justifiable expectations that students could "attend a school in a nonresident district." Ark. Code Ann. § 6-18-1903(a) (2013). Although the 2013 Act gave the nonresident school district the discretion to decide whether to accept a student seeking transfer, id. § 6-18-1903(d)(1), the terms of the 2013 Act illustrate that the legislature envisioned that the *capacity* of the nonresident school district would be the only and exclusive determining factor as to whether the nonresident school district accepted a student's transfer application. See id. § 6-18-1903(d)(2), (3) (prohibiting a nonresident district from considering an applicant's academic achievements, athletic or other extracurricular ability, English proficiency level, or disciplinary record in evaluating their application for transfer).[11] Additionally, the 2013 Act provided that a nonresident district had to state a reason

_____

[10]The 2013 Act's broad school choice transfer option as recognized by Teague authorizes the transfer of the "entire educational process," as it is defined by Goss. Ante at 19 (quotation omitted). And, the district court opinion cited by the court, Mazevski v. Horseheads Central School District, 950 F. Supp. 69 (W.D.N.Y. 1997), does not support a contrary holding. Mazevski deals not with a nonresident, interschool district transfer of the entire educational experience as is contemplated by the 2013 Act and appellants. Rather, the limitation imposed in Mazevski involved a single student being precluded from performing with his school's marching band–from which he was dismissed for individual misconduct. The 2013 Act's exemption clause was in no way designed to create "individual component[s]" of the Arkansas *educational* experience–it was a broad administrative procedure improperly employed in this case to wholly abort the appellants' children's entire educational process in a nonresident district of their parents' choice.

[11]And, in fact, aside from the applicant's personal information–name, age, grade level, home address, etc.–the only other information the application for transfer under the 2013 Act requested was the name and address of the applicant's resident school district and the name and address of the nonresident school district the applicant wished to attend.

for the rejection if the student's transfer application was not accepted. Id. § 6-18-1905(b)(2). Finally, the 2013 Act provided that an applicant whose transfer application was rejected was entitled to a hearing before the state board to reconsider the transfer, as long as she submitted a request for the hearing in writing within ten days after receipt of her rejection. Id. § 6-18-1907(b)(1), (2)(A). Thus, as later explained in more detail, the public school choice transfer right established in the 2013 Act was more than "a mere subjective expectancy of school choice," ante at 20. Under the 2013 Act, the appellants had a "legitimate claim of entitlement," id. at 18 (quotation omitted), to "choose from among different schools with differing assets," Ark. Code Ann. § 6-18-1901(b)(1) (2013), and when the Blytheville District wrongly and unconstitutionally exempted itself from the 2013 Act, the Blytheville District unlawfully deprived appellants of their protected property interest and hearing rights. The appellants clearly establish that the Blytheville District did not afford them adequate and statutorily specified procedural rights designed to protect their constitutionally protected property interests, and thus the Blytheville District violated the appellants' due process rights, see ante at 15, for which violations the appellants are entitled to monetary damages.[12]

---

[12]In a further attempt to void this statutorily established and constitutionally protected school transfer prerogative, the district court and this court seek to disembowel and thus, overrule the thrust of the Supreme Court's holding in Goss. To do so, the district court and this court assert that the 2013 Act created only a "mere subjective expectancy of school choice." Ante at 20. In this effort, this court cites a series of inapplicable rules, irrelevant dictionary definitions and inapposite case law. The court accurately states, and then disregards, the fact that the only limiting acceptance choice the 2013 Act provides a receiving school district concerning a transferring student's property right is the student "capacity" of such receiving school. But, in this dispute, the unlawful Blytheville District exemption claim sought to and did miscarry any attempt by the appellants to test this "capacity" question in the putative receiving districts. How this de minimis and untested capacity limitation can be allowed to derail the appellants' constitutionally protected property interests, without a statutorily required hearing of any nature, is not explained or even addressed by this court.

II.

I also disagree with the court's analysis of appellants' demand for damages under their equal protection claims. Despite the court's finding to the contrary, see id. at 26-27, nothing in the record in this case generated "at least a rational basis for [Blytheville District's] believing that the 2013 Act authorized it to take the

---

The court's sole cited precedent for this unsupportable "subjective expectancy" contention is an unpublished Fifth Circuit case, Horton v. City of Smithville, 117 F. App'x 345, 347-48 (5th Cir. 2004) (unpublished). Strangely, this case deals not with a constitutionally protected property interest, but with whether the appellant, Horton, had a property interest in the City of Smithville's lack of enforcement of the city's zoning ordinance prohibiting the staging of a live music event on a neighbor's property. The answer by the court was that he did not. Id. at 348. However, what light the Horton decision sheds upon whether the appellants in this case have an actionable constitutionally based property interest granted by the Arkansas statute is wholly shaded. And importantly, the Horton case is of dubious force as citable precedent since the Fifth Circuit attaches no precedential value to an unpublished opinion, Fifth Circuit Appellate Rule 47.5.4, and neither does this circuit. Eighth Circuit Appellate Rule 32.1A.

It is also worth mentioning that the Arkansas statute explicitly states that a "school district receiving transfers under this [school choice] act shall not discriminate on the basis of gender, national origin, race, ethnicity, religion, or disability." Ark. Code Ann. § 6-18-1903(d)(3). Thus, it is patently inconsistent with the general racial policies established in the 2013 Act that the Board of Directors of the Blytheville District should now attempt to oppose appellants' school transfer efforts with its letter of April 22, 2015, to the Arkansas Department of Education (ADE), which letter raises issues of "desegregation obligations . . . (*i.e.*, the creation, maintaining, or increasing of racially identifiable schools)." Ante at 13. Such issues were put to rest by Judge Eisele's interdicting dismissal order of December 6, 1978. This is an especially questionable argument by the Blytheville District given the blind eye presented by its Board of Directors to the 250 student exodus in 2009 mostly from the Blytheville District to the Kipp Delta Academy School "the majority of whom [were] African Americans or other minorities." Ante at 24.

-34-

exemption." Id. at 28. Indeed, the record clearly prevented the Blytheville District from nullifying appellants' attempted transfers to the nonresident district. No reasonable reading of Franklin v. Board of Education of the Blytheville, Arkansas, School District No. 5, No. J-71-C-35 (E.D. Ark.), allowed the Blytheville District to believe it was still subject to a desegregation order of any nature.

Judge Eisele on August 19, 1971, entered an order that approved Blytheville District's desegregation plan for its high school, junior high schools, and elementary schools. In that same order, the court further approved the Blytheville District's desegregation plan with respect to faculty and administrative staff assignments–with four minor reservations. On June 21, 1973, Judge Eisele, noted that the items reserved as mentioned above "are no longer a subject of controversy" and closed the case, reserving jurisdiction "for necessary and appropriate purposes." Five years later, on December 6, 1978, Judge Eisele issued an order fully dismissing the Franklin case. Thus, the plain language of these orders leaves no doubt that the Franklin court closed the case and ultimately ceded jurisdiction over the case and the parties. Therefore, as earlier noted, the Blytheville District had no rational basis for believing it was still subject to a desegregation order, and consequently no means of lawfully exempting itself from the 2013 Act.[13] The Blytheville District's violation of the 2013

[13]As the court notes, the Blytheville District also claims that a May 31, 1973, letter sent from the United States Department of Health, Education, and Welfare (HEW) is a "mandate by a federal agency that it cannot return to the dual school system." Ante at 28. The record is clear that this claimed continuing mandate is unfounded. The HEW letter stated that the Blytheville District "must modify its [desegregation] plan *as may be ordered by the court* to remain in compliance." (Emphasis added.). Less than a month later, Judge Eisele issued his June 21, 1973, order finding that the matters mentioned in the HEW letter were "no longer a subject of controversy" and he then closed the case. The timing of Judge Eisele's June 21, 1973, order in relation to the May 31, 1973, HEW letter obviously establishes that he felt no further modification of the desegregation plan was necessary for the school district to "remain in compliance." Further, once Judge Eisele ceded jurisdiction in

Act and the subsequent disparate treatment that resulted–allowing intra-district transfers to the Kipp Delta charter school, but denying appellants' inter-district transfers under the 2013 Act–violated appellants' equal protection rights, for which appellants are entitled to monetary damages.

The district court strangely found–apparently responding to Blytheville District's wholly frivolous contention that Judge Eisele's order should have contained some "unitary school system" language–that even after the passage of at least thirty-seven years of Blytheville District's lawful operation as a unitary (non-dual) school

_____

the case over the parties through his December 6, 1978, order, the court no longer retained any authority to order the school district to modify its desegregation plan. Thus, HEW's May 31, 1973, letter, on its own, cannot credibly be read as a "mandate of a federal … agency remedying the effects of past racial segregation," because the letter instructs the school district to follow any order "by the court," which later closed the case and ceded jurisdiction over the parties. As a result, since at least 1978 there has no longer been an active desegregation plan which the government or a private party could "seek modification of," and there is also no way for the Blytheville District to fall out of compliance with a long since-closed desegregation order.

The district court and this court found credible the Blytheville District's argument that the February 11, 1971, HEW letter to the school district and the May 31, 1973, HEW letter to the ADE continue to stand as "active mandates" prohibiting changes that in any manner increase "racially identifiable schools." In this case, the Blytheville District's argument obviously means not permitting any "Caucasian" exodus from the district. This active mandate stands, according to the Blytheville District, and now this court, notwithstanding Judge Eisele's interdiction order of December 6, 1978, and according to the record in this case, the passage of at least thirty-seven years of the Blytheville District's operation of a desegregated "unitary non-racial" school system and accompanied by no evidence of any activities causing substantial racial imbalance changes in the district except, perhaps, the Blytheville District's authorized movement of the 250 students to Kipp Delta Academy in 2009. Ante at 24.

-36-

system, the Blytheville District was still subject to a <u>Franklin</u> desegregation order. This was error. The district court's incorrect holding that Judge Eisele, in <u>Franklin</u>, should have made a specific finding that the Blytheville District had achieved unitary status in order to properly dismiss the August 1971 desegregation action is based on inapposite cases and faulty analysis of applicable law. Indeed, at the time the <u>Franklin</u> court dismissed the action in 1978, there was *no* case law requiring a finding of unitary status in order to properly close a desegregation order. The two cases the district court relies on for the requirement that a finding of unitary status is necessary are <u>Jenkins by Jenkins v. State of Missouri</u>, 122 F.3d 588 (8th Cir. 1997), and <u>Lockett v. Board of Education of Muscogee County</u>, 92 F.3d 1092 (11th Cir. 1996). Not only were these two cases decided nearly two decades after <u>Franklin</u>, both cases are factually distinguishable from <u>Franklin</u>. In <u>Lockett</u>, the court ordered the school district to present and implement a desegregation plan in 1971 and continued to maintain jurisdiction over the case into the 1990s, even though the district court "ignored the school district's actions after 1980." <u>Id.</u> at 1097-98. Similarly in <u>Jenkins</u>, the district court still had jurisdiction over the desegregation action, and action in the case was ongoing, into the 1990s. <u>Jenkins by Jenkins</u>, 122 F.3d at 590-91. Conversely, in <u>Franklin</u>, the case was dismissed for all purposes and without appeal in 1978, long before the case law established, if any binding litigation ever has, any precedent that required district courts to make an express finding of unitary status. In sum, the unitary status contention frivolously asserted by the Blytheville District and wrongly accepted by the district court was simply an unsupportable excuse for improperly urging a non-existent transfer exemption–not a basis for the district court's interference with the transfers.

Contrary to the district court's findings, the <u>Franklin</u> court had done all that was required to close the case. When the <u>Franklin</u> case was dismissed in 1978, if a school district had achieved the objectives of a desegregation order, the district court's remedial authority over those objectives was ended and the injunction was dissolved. <u>See</u> <u>Pasadena City Bd. of Educ. v. Spangler</u>, 427 U.S. 424, 436-37 (1976). Judge

Eisele's actions in the <u>Franklin</u> case make clear that he believed the Blytheville District had achieved the objectives of all desegregation orders.  Thus there is no credible evidence that the Blytheville District has been subject to a desegregation order related to the <u>Franklin</u> case since December 6, 1978.

Penultimately, with regard to the Blytheville District's transfer exemption claim, I note that the Board of Directors of the Blytheville District do not and cannot deny that they, and their predecessor Boards, have actually operated a desegregated unitary public school system since at least 1978.  There also appears to be no evidence in this case, or even any claims, that a dual, segregated public school system or any vestiges of the same has in any way operated since Judge Eisele's final order in 1978.  Accordingly, the Blytheville District's exemption claims were, in substance, wholly specious.

Finally, in the alternative, the district court erred in granting summary judgment in favor of the Blytheville District.  Summary judgment is only proper if there are no genuine issues of material fact.  Fed. R. Civ. P. 56.  A district court's finding of unitary status is a finding of fact, reviewed for clear error.  <u>Fisher v. Tucson Unified School Dist.</u>, 652 F.3d 1131, 1136 (9th Cir. 2011).  In the instant case then, if there is a genuine dispute as to whether there is or is not unitary status, as seemingly advanced by the Blytheville District, the granting of summary judgment to the Blytheville District was erroneous.

For the aforementioned reasons, I respectfully dissent on the issue of the appellants' damages arising from their procedural due process and equal protection claims and would remand the issues back to the district court to determine monetary damages, costs, and fees.

_____